| | |
|---|---|
| AUSA:   Shankar Ramamurthy | Telephone:  (313) 226-9562 |
| Special Agent:   Andrew Crump | Telephone:  (313) 670-5817 |

AO 108 (Rev. 06/09)  Application for a Warrant to Seize Property Subject to Forfeiture

# UNITED STATES DISTRICT COURT
for the
Eastern District of Michigan

In the Matter of the Seizure of
*(Briefly describe the property to be seized)*
All funds on deposit in 4 Bank of America Accounts as
further described on Attachment A

)
)
)
)
)

Case No.

Case: 2:20−mc−50628
Assigned To : Michelson, Laurie J.
Assign. Date : 6/5/2020
Description: RE: SEALED MATTER
(EOB)

## APPLICATION FOR A WARRANT
## TO SEIZE PROPERTY SUBJECT TO FORFEITURE

I, a federal law enforcement officer or attorney for the government, request a seizure warrant and state under penalty of perjury that I have reason to believe that the following property in the _____Eastern_____ District of _____Michigan_____ is subject to forfeiture to the United States of America under _____ U.S.C. § See Below _____ *(describe the property)*:

18 U.S.C. §§ 981(a)(1)(A) and (C); 18 U.S.C. § 982(a); 21 U.S.C. § 881(a); and 28 U.S.C. § 2461 -- All funds on deposit in 4 Bank of America Accounts as further described on Attachment A

The application is based on these facts:
See Attached Affidavit

☐ Continued on the attached sheet.

_____
*Applicant's signature*

FBI SA Andrew F. Crump
*Printed name and title*

Sworn to before me and signed in my presence
and/or by reliable electronic means.

Date:   ___June 5, 2020___

_____
*Judge's signature*

City and state:   _Detroit, MI_

David R. Grand                          U. S. Magistrate Judge
*Printed name and title*

## <u>AFFIDAVIT IN SUPPORT OF SEIZURE WARRANTS</u>

I, Andrew F. Crump, Special Agent for the Federal Bureau of Investigation, being duly sworn, depose and state as follows in support of the government's application for the issuance of seizure warrants for funds in the following bank, investment, and insurance accounts, collectively referred to as the **Target Accounts**:

1. **JP Morgan Chase Bank Account No. 473353055, in the name of Heartland Pharmacy 2, LLC;**

2. **JP Morgan Chase Bank Account No. 464668685, in the name of Heartland Pharmacy, LLC;**

3. **Bank of America Account No. 375008953994, in the name of Wayne Campus Pharmacy, LLC;**

4. **Bank of America Account No. 005405242693, held in the name of Universal Pharmacy, LLC;**

5. **JP Morgan Chase Bank Account No. 2042883021**, **held in the name of Kindy Ghussin**

6. **Key Bank Account No. 327840071176, held in the name of Kindy Ghussin;**

7. **Bank of America Account No. 5961375028, held in the name of Hassan Abdallah;**

8. **Michigan First Credit Union account No. 15041894, held in the name of Auday Maki;**

9. **Michigan First Credit Union Account No. 10556740, held in the name of Auday Maki and Salwa Atwan;**

10. **JP Morgan Chase Bank Account No. 766261051, held in the name of Hassan Khreizat;**

1

11.     Bank of America Account No. 375014032993, held in the name of Hassan Khreizat;

12.     Fifth Third Bank Account No. 7914512301, held in the name of Hassan Khreizat;

13.     Flagstar Bank Account No. 128170579, held in the name of Nofal Cholag

14.     Flagstar Bank Account No. 570421834, held in the name of Nofal Cholag;

15.     TCF National Bank Account No. 2883080947, held in the name of Nofal Cholag;

16.     TCF National Bank Account No. 5444525668, held in the name of Nofal Cholag;

17.     Bank of America Account No. 37500823404, held in the name of Raef Hamaed;

18.     JP Morgan Chase Bank Account No. 936801232, held in the name of Raef Hamaed;

19.     Citizens Bank Account No. 3650366735, held in the name of Raef Hamaed;

20.     Bank of America Account No. 375007629106, held in the name of Raef Hamaed;

21.     Flagstar Bank Account No. 108125122, held in the name of Ali Abdelrazzaq;

The funds to be seized from the **Target Accounts** constitute a portion of the

proceeds of a health care fraud, wire fraud, and money laundering scheme that

resulted in over $15 million in Medicare, Medicaid, and private insurance funds being fraudulently reimbursed to multiple pharmacies and their owners, between February 2011 and July 2019.

## INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent with the Federal Bureau of Investigation (FBI), duly appointed according to law and acting as such, and have been employed as such since October 2014.  As a Special Agent in the FBI, I have received general law enforcement training at the FBI Academy, as well as specialized training on the subjects of health care fraud, money laundering and telephone analysis from the FBI, and I have been personally involved in investigations concerning health care fraud, prescription drug diversion and methods used to finance and conceal the profits of those operations.  I have interviewed numerous self-proclaimed drug users, medical doctors, and owners and employees of medical clinics.  I have investigated and conducted surveillance on numerous doctors, pharmacies and prescription drug dealers.  I have consulted with agents and officers of numerous federal, state, and local agencies in gaining an understanding of current trends in the diversion of prescription drugs and health care fraud.  I am currently assigned to the Detroit Division of the FBI and my duties include investigating health care fraud and prescription drug diversion

2.      Based on my training, experience, and participation in financial

3

investigations involving the concealment of funds and assets in order to prevent

detection by law enforcement agencies, I have observed that:

   a. Individuals involved in illegal activities often generate large amounts
      cash and money through those activities. These individuals often use
      the cash and money to facilitate the operation of their illegal activities
      by disguising fund transfers to close associates as legitimate income
      payments, and purchasing legitimate personal items, such as housing,
      cars, jewelry, and clothing.

   b. Individuals attempting to conceal their income or illegal activities
      frequently transfer assets to friends, relatives, or close associates to
      avoid detection of those assets by the IRS and other government
      agencies. Even though such assets are in the names of others, the true
      owners of the assets typically continue to exercise dominion and
      control over these assets.

   c. Individuals involved in illegal activities often use banks to conduct
      financial transactions involving proceeds of their criminal activities.
      Such individuals often establish multiple businesses and transfer funds
      between accounts to disguise the nature, source, ownership, control,
      and location of criminal proceeds, and to make their wealth appear to
      have been obtained legitimately. Such individuals also often
      commingle their criminal proceeds with legitimate funds in bank
      accounts or other financial accounts in order to conceal the illegal
      source of their criminal proceeds.

I refer to these methods that criminals often use to conceal the nature, source,

ownership, control, and location of their criminal proceeds as "money laundering."

   3.    As a Special Agent with the FBI, I am responsible for investigating

violations of United States federal law, including, but not limited to Title 18,

United States Code, Section 1347 (Health Care Fraud), Title 18, United States

Code, Section 1343 (Wire Fraud), and Title 18, United States Code, Section 1349

(Conspiracy to Commit Health Care Fraud). I have participated in the execution of search warrants for documents and other evidence as well as seizure warrants in cases involving violations of these offenses.

4.     I have knowledge of the facts set forth in this affidavit as a result of my participation in the investigation and information provided to me by other law enforcement agents. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this investigation.

## PURPOSE OF THE AFFIDAVIT

5.     This affidavit is submitted in support of an Application seeking authorization to seize and/or freeze funds on deposit contained in the bank, investment, or insurance accounts listed in the **Target Accounts**.

6.     As discussed herein, the statements in this affidavit are based upon information I learned during the investigation, including information provided to me by other law enforcement agents and government contractors and upon my experience and background as an FBI Special Agent. Since this affidavit is being submitted for the limited purpose of supporting seizure warrants, I have not included every fact known to me concerning this investigation. This affidavit is intended to show merely that sufficient probable cause exists for the requested seizure warrants and does not set forth all of my knowledge about this

investigation.

7.     Based upon my training and experience, and the information set forth in this affidavit, there is probable cause to believe that the funds in the target accounts constitute: (a) the proceeds of illegal activity, and/or property traceable to proceeds of illegal activity, specifically wire fraud in violation of 18 U.S.C. 1343, health care fraud in violation of 18 U.S.C. 1347, and conspiracy to commit health care fraud in violation of 18 U.S.C. 1349; (b) the gross proceeds of illegal activity, and/or property traceable to gross proceeds of illegal activity, specifically health care fraud in violation of 18 U.S.C. 1343 and 18 U.S.C. 1347; and/or, (c) property involved in, or traceable to property involved in money laundering, in violation of 18 U.S.C. 1956 and 1957. As such, these funds are subject to seizure and civil and/or criminal forfeiture pursuant to 18 U.S.C. §§ 981 (a)(1)(A) and (C), 18 U.S.C. §§ 982(a)(1) and (7), 18 U.S.C. § 1956(c)(7)(F), and 28 U.S.C. § 2461(c).

## **VIOLATION STATUTES**

8.     Title 18, United States Code, Section 1347, prohibits health care fraud:  Whoever knowingly and willfully executes, or attempts to execute, a scheme or artifice—

(1) to defraud any health care benefit program; or

(2) to obtain, by means of false or fraudulent pretenses, representations, or

promises, any of the money or property owned by, or under the custody or

control of, any health care benefit program, in connection with the delivery of or payment for health care benefits, items, or services, shall be fined under this title or imprisoned not more than 10 years, or both.

9.      Title 18, United States Code, Section 1343, prohibits wire fraud: Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

10.     Title 18, United States Code, Section 1349, provides that any person who attempts or conspires to commit health care fraud or wire fraud shall be subject to the same penalties as those proscribed in 18 U.S.C. § 1347 and 18 U.S.C. § 1343, respectively.

11.     Title 18, United States Code, Section 24(b), defines a "health care benefit program" as, among other things, "any public or private plan . . . affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service, for which payment may be made under the plan."

7

12.     Title 18 of the United States Code, Section 1956 prohibits engaging in monetary transactions in property derived from specified unlawful activity:

(a)(1) Whoever, knowing that the property involved in a financial transaction represents proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity –

(A) with the intent to promote the carrying on of a specified unlawful activity;

(B) knowing that the transaction is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership or control of the proceeds of specified unlawful activity.

13.     Title 18, United States Code, Section 1957 prohibits knowingly engaging in or attempting to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity.

14.     Title 18, United States Code, Section 1956, sets forth a list of "specified unlawful activities," which includes, "any act or activity constituting an offense involving a Federal health care offense." *See* 18 U.S.C. § 1956(c)(7)(F).

**APPLICABLE FORFEITURE STATUTES**

15.    18 U.S.C. § 981 *Civil Forfeiture*

(a) (1) The following property is subject to forfeiture to the United States:

(A) Any property, real or personal, involved in a transaction or attempted transaction in violation of section 1956, 1957 or 1960 of this title, or any property traceable to such property.

\*          \*          \*          \*

(C) Any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of section 215, 471, 472, 473, 474, 476, 477, 478, 479, 480, 481, 485, 486, 487, 488, 501, 502, 510, 542, 545, 656, 657, 842, 844, 1005, 1006, 1007, 1014, 1028, 1029, 1030, 1032, or 1344 of this title or any offense constituting "specified unlawful activity" (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense.

(b)(1) Except as provided in section 985, any property subject to forfeiture to the United States under subsection (a) may be seized by the Attorney General and, in the case of property involved in a violation investigated by the Secretary of the Treasury or the United States Postal Service, the property may also be seized by the Secretary of the Treasury or the Postal Service, respectively.

(b)(2) Seizures pursuant to this section shall be made pursuant to a warrant obtained in the same manner as provided for a search warrant under the Federal Rules of Criminal Procedure . . . .

(b)(3) Notwithstanding the provisions of rule 41(a) of the Federal Rules of Criminal Procedure, a seizure warrant may be issued pursuant to this subsection by a judicial officer in any district in which a forfeiture action against the property may be filed under section 1355(b) of title 28, and may be executed in any district in which the property is found.

16.    18 U.S.C. § 982 *Criminal Forfeiture*

(a)(7) The court, in imposing sentence on a person convicted of a Federal health care offense, shall order the person to forfeit property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense.

17.    18 U.S.C. § 984   *Civil Forfeiture of Fungible Property*

(a)(1) In any forfeiture action in rem in which the subject property is . . funds deposited in an account in a financial institution . . .

(A)            it shall not be necessary for the Government to identify the specific property involved in the offense that is the basis for forfeiture; and

(B) it shall not be a defense that the property involved in such an offense has been removed and replaced by identical property.

18.    "If a person is charged in a criminal case with a violation of an Act of Congress for which civil or criminal forfeiture of property is authorized, the Government may include notice of the forfeiture in the indictment or information pursuant to the Federal Rules of Criminal Procedure.  If the defendant is convicted of the offense giving rise to the forfeiture, the court shall order the forfeiture of the property as part of the sentence in the criminal case." 28 U.S.C. § 2461(c).

## THE MEDICARE AND MEDICAID PROGRAMS

19.    The Medicare Program ("Medicare") is a federally funded health care program providing benefits to persons who are sixty-five years of age or older or disabled. Medicare is administered by the Centers for Medicare and Medicaid

Services ("CMS"), a federal agency within the Department of Health and Human Services ("HHS"). Individuals who receive Medicare benefits are Medicare "beneficiaries."

20.    Medicare is a "health care benefit program," as defined by 18 U.S.C. § 24(b).

21.    Medicare has four parts: hospital insurance (Part A), medical insurance (Part B), Medicare Advantage (Part C), and prescription drug benefits (Part D). Medicare Part B helps pay the cost of physician services, medical equipment and supplies, and other health services and supplies not paid by Part A. This investigation involves Medicare Part D, prescription drug benefits.

22.    A pharmacy can participate in Medicare Part D by entering into a retail network agreement directly with a plan or with one or more Pharmacy Benefit Managers ("PBMs"). A PBM acts on behalf of one or more Medicare drug plans. Through a plan's PBM, a pharmacy can join the plan's network. When a Medicare Part D beneficiary presents a prescription to a pharmacy, the pharmacy submits a claim either directly to the plan or to a PBM that represents the beneficiary's Medicare drug plan. The plan or PBM determines whether the pharmacy is entitled to payment for each claim and periodically pays the pharmacy for outstanding claims. The drug plan's sponsor reimburses the PBM for its payments to the

pharmacy. PBMs sometimes contract with Pharmacy Services Administrative Organizations ("PSAOs") to administer some of its services, such as payments.

23.     CVS Caremark, OptumRx, and Express Scripts are three of several PBMs. CVS Caremark processes and adjudicates claims electronically in Arizona. OptumRx and Express Scripts process and adjudicate claims electronically outside the state of Michigan.

24.     Medicare, through CMS, compensates the Medicare drug plan sponsors and pays the sponsors a monthly fee for each Medicare beneficiary of the sponsors' plans. Such payments are called capitation fees. The capitation fee is adjusted periodically based on various factors, including the beneficiary's medical conditions. In addition, in some cases where a sponsor's expenses for a beneficiary's prescription drugs exceed that beneficiary's capitation fee, Medicare reimburses the sponsor for a portion of those additional expenses.

25.     By becoming a participating provider in Medicare, enrolled providers agree to abide by the policies, procedures, rules, and regulations governing reimbursement. To receive Medicare funds, enrolled providers, together with their authorized agents, employees, and contractors, are required to abide by all the provisions of the Social Security Act, the regulations promulgated under the Act, and applicable policies, procedures, rules, and regulations, issued by CMS and its authorized agents and contractors.

26.    Medicare providers are required to maintain all records that disclose the extent of services provided and significant business transactions for a period of at least six years.

27.    Qlarant is the Medicare Part C and Part D program integrity contractor for CMS under the National Benefit Integrity Medicare Drug Integrity Contract ("MEDIC"). Qlarant's role is to detect, prevent, and investigate allegations of fraud, waste, and abuse in the Part C (Medicare Advantage organizations) and Part D (prescription drug coverage) programs on a national level.

28.    The Michigan Medicaid Program ("Medicaid") is a federal and state funded health care program providing benefits to individuals and families who meet specified financial and other eligibility requirements and certain other individuals who lack adequate resources to pay for medical care. CMS is responsible for overseeing the Medicaid program in participating states, including Michigan. Individuals who receive benefits under the Medicaid program are also referred to as "beneficiaries."

29.    Medicaid covers the costs of medical services and products ranging from routine preventive medical care for children to institutional care for the elderly and disabled. Among the specific medical services and products provided by Medicaid are reimbursements to pharmacies for the provision of prescription drugs.

Generally, Medicaid covers these costs if, among other requirements, they are medically necessary and ordered by a physician.

## BLUE CROSS BLUE SHIELD OF MICHIGAN

30.     Blue Cross and Blue Shield of Michigan ("BCBS") was a nonprofit, privately operated insurance company authorized and licensed to do business in the state of Michigan.  BCBS provided health care benefits, including prescription drug benefits, to member entities and individuals.  Individuals insured by BCBS were referred to as BCBS "members."

31.     BCBS had agreements with participating providers, including pharmacies, to furnish medical services to BCBS members.

32.     BCBS was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

### Relevant Entities and Individuals

#### Heartland Pharmacy

33.     Heartland Pharmacy LLC ("Heartland") was a registered business entity with the Ohio Secretary of State. The following information is based on publicly available documents filed with the Ohio Secretary of State on Heartland's behalf. Heartland's Articles of Organization were filed on March 21, 2012 and reflect that Ghussin established the entity. Heartland's registered address was 3415 Riva Court, Beavercreek, Ohio 45430, which according to public records, including

Ghussin's driver's license, is Ghussin's residence. Heartland's articles of organization list Ghussin as the statutory agent.

34.     An FBI agent and I reviewed September 2014, December 2016, and December 2017 Express Scripts provider certifications for Heartland, all signed by Ghussin, which listed the practice address for the pharmacy as 3000 Far Hills Avenue, Kettering, Ohio, 45429. According to that documentation, Heartland had been open since at least the end of 2012. The September 2014 and December 2016 provider certifications reflect that Ghussin, Abeer Rizek, Hassan Abdallah ("Abdallah"), and Raef Hamaed ("Hamaed") each owned 25% of Heartland. The December 2017 provider certification lists Ghussin as a 34% owner, Abdallah as a 33% owner, and Hamaed as a 33% owner. All of the forms identify Ghussin as the pharmacist in charge ("PIC").

### Heartland Pharmacy 2

35.     Heartland Pharmacy 2, LLC ("Heartland 2") was a registered business entity with the Ohio Secretary of State. The following information is based on publicly available documents filed with Ohio Secretary of State on Heartland 2's behalf. Heartland's Articles of Organization were filed on June 7, 2012 and reflect that Ghussin established the entity. Heartland 2's registered address was 3415 Riva Court, Beavercreek, Ohio 45430, which, as stated above, is Ghussin's residence. Heartland 2's articles of organization list Ghussin as the statutory agent.

36.     An FBI agent and I reviewed a September 2014 Express Scripts provider certification for Heartland 2, which listed the practice address for the pharmacy as 2749 West Alex Bell Road, Moraine, Ohio 45459. According to that documentation, Heartland 2 had been open since at least approximately September 2012 and Ghussin, Abdallah, and Hamaed were each listed as owners. Ghussin was listed as a 33.34% owner, Abdallah was listed as a 33.33% owner, and Hamaed was listed as a 33.33% owner. Balhar Singh ("Singh") was listed as the PIC.

<u>City Drugs Pharmacy</u>

37.     City Drugs was a registered business entity with the Michigan Department of Licensing and Regulatory Affairs ("LARA"). The following information is based on publicly available documents filed with LARA on City Drugs' behalf. Auday Maki ("Maki"), Mohrib Abdallah ("Mohrib"), and Raef Hamaed ("Hamaed") incorporated City Drugs on September 17, 2008. According to the Certificate of Incorporation, City Drugs' registered address was 11190 Gratiot Ave., Detroit, MI 48213, which is Subject Premises 1. City Drugs' most recent annual report was for the year 2017 and listed Maki as the Resident Agent. In 2019, Salwa Atwan ("Atwan"), President, filed a certificate of dissolution on behalf of City Drugs. According to public records and financial records the government has reviewed, Atwan appears to be Maki's spouse.

<u>Park Med Pharmacy</u>

16

38.     Park Med Pharmacy is a registered business entity with LARA. The following information is based on publicly available documents filed with LARA on Park Med Pharmacy's behalf. Park Med Pharmacy was organized on October 17, 2017. Park Med Pharmacy's articles of organization identify Maki as the resident agent. Park Med Pharmacy's 2020 annual report listed Maki as the resident agent and the registered office as Subject Premises 2A.

### Eastside Pharmacy

39.     Eastside was a registered business entity with LARA. The following information is based on publicly available documents filed with LARA on Eastside's behalf. Hassan Khreizat ("Khreizat"), Hamaed, and Hassan Abdallah ("Abdallah") incorporated Eastside on January 16, 2009. The registered address for Eastside was 11854 E. Warren Ave., Detroit, MI 48215. Eastside's most recent annual report was filed for the year 2015 and listed Hamaed as the resident agent. On November 7, 2016, a certificate of change of registered office and/or change of resident agent was filed, changing the resident agent to Abdallah.

### Conner Pharmacy

40.     Conner is a registered business entity with LARA. The following information is based on publicly available documents filed with LARA on Conner's behalf. Conner was organized on October 1, 2014. According to the Articles of

Organization, the resident agent was Rami Zbib. On March 26, 2016, a certificate of change of registered office and/or change of resident agent was filed, changing the resident agent to Hassan Ghoul ("Ghoul"). The form listed Ghoul's title as owner. Conner's most recent annual report was filed for the year 2019 and listed Ghoul as the resident agent and the registered office as Subject Premises 3.

Universal Pharmacy

41.    Universal Pharmacy is a registered business entity with LARA. The following information is based on publicly available documents filed with LARA on Universal's behalf. Khreizat organized Universal on January 7, 2008. According to the Articles of Organization, Khreizat was also the resident agent. Universal's 2020 annual report listed Nofal Cholag ("Cholag") as the resident agent and the registered office as 4600 E. 14 Mile Rd., Suite 2, Warren, MI 48092.

Wayne Campus Pharmacy

42.    Wayne Campus is a registered business entity with LARA. The following information is based on publicly available documents filed with LARA on Wayne Campus's behalf. Wayne Campus was incorporated on May 18, 2011. On September 21, 2011, the Articles of Organization were amended to change the resident agent to Abdallah and a certificate of change of registered office and/or change of resident agent was filed changing the resident agent to Abdallah. Wayne Campus's most recent annual report for the year 2015 listed Abdallah as the resident

agent and the registered office as 1131 W. Warren, Detroit, MI 48201.

43.     The provider certification dated April 17, 2015 listed the owners as Ali Abdelrazzaq ("Abdelrazzaq") (30%), Abdallah (18%), Kindy Ghussin ("Ghussin") (16%), Hamaed (18%), and Abeer Rizek ("Rizek") (18%); I know from reviewing public records and U.S. Customs and Border Patrol Reports that Rizek is married to Tarek Fakhuri ("Fakhuri"). Abdelrazzaq was listed as the PIC. The December 12, 2017 provider certification listed Abdelrazzaq as the 100% owner and PIC. According to documents provided by LARA, Abdelrazzaq became the 100% owner in early 2017.

### St. Clair Pharmacy

44.     St. Clair is a registered business entity with LARA. The following information is based on publicly available documents filed with LARA on St. Clair's behalf. According to the Articles of Organization, Ghoul organized St. Clair on July 17, 2017, Ghoul was the resident agent, and the registered office was 6635 Cottonwood Knoll, West Bloomfield, MI 48322, Ghoul's home address. On December 15, 2017, a certificate of change of registered office and/or change of resident agent was filed, changing the Registered Office address to 23600 Harper Ave., Suite 101, Saint Clair Shores, MI 48080.

45.     The provider certification that St. Clair provided to Express Scripts, a PBM, the practice address for St. Clair listed Ghoul (50%) and Mussa Mustapha

(50%) as the owners and Ahmad Reslan ("Reslan") as the PIC.

## **FRAUD SCHEME**

46.     A common pharmacy fraud scheme is to bill Medicare, Medicaid, and other health insurers for medication that the pharmacy does not actually dispense to patients. Put another way, at a high-level, the pharmacy is submitting a higher volume of medication in claims to Medicare, Medicaid, and other insurers than it purchased during the relevant period; based on my experience and training, this is often referred to as a "shortage" scheme. This is indicative of fraud because a pharmacy cannot dispense more medications than it has purchased. Typically, although not always, Medicare and Medicaid pay significant sums for these "shortage" medications. For example, inhalers and pain creams are common shortage medications because insurers may pay hundreds of dollars for those medications. However, pharmacies can bill but not dispense any medication. Over the course of the last four-plus years I have investigated shortage schemes, I have interviewed many patients, who have told me that both expensive and inexpensive medications (ranging from inhalers like Advair, Symbicort, QVAR, Spiriva, and HIV medication to creams and other items) were billed to Medicare, Medicaid, and other insurers that they never received from a particular pharmacy.

47.     I will provide a simplified overview of how the shortage analysis is conducted to assist the Court in evaluating this search warrant application. In

general, investigating a shortage scheme involves three steps: first, agents obtain a pharmacy's drug purchase records from pharmaceutical wholesalers. Agents identify wholesalers based on financial records for the pharmacy and its owner, which identify purchases from wholesalers, and submissions from the pharmacy to state regulators and PBMs about the wholesalers used by the pharmacies; second, agents obtain Medicare and Medicaid claims data for the pharmacy; third, agents request that Qlarant conduct a shortage analysis for the time period for which it has drug purchase records and claims data.

48.     Using the pharmacy's purchase records from the wholesalers and the claims data, Qlarant will pick a representative sample of prescription medications and compare the volume purchased with the volume dispensed in Medicare and Medicaid claims. Qlarant will then identify the volume of any shortage for each medication reviewed and the estimated amount that Medicare and Medicaid would have paid for medication billed but not dispensed. Because this analysis generally does not include claims data from any private insurers, the shortage amounts are conservative numbers because they do not incorporate any claims for that medication billed to private insurers.[1]

---

[1]   However, because Blue Cross Blue Shield ("BCBS") is a major health insurance company in Michigan, once Qlarant determines which medications were short, BCBS is often asked to provide the sum that it paid on claims that pharmacy submitted for the shortage medications.

49.     Based on the shortage analyses performed in this investigation, the owners and operators of the aforementioned pharmacies fraudulently billed Medicare, Medicaid, and other insurers for medications that were not dispensed to beneficiaries. The pharmacies did not have sufficient drug inventory to dispense numerous expensive medications billed to Medicare and Medicaid.

50.     Pharmacies will also submit claims for medications disbursed to patients that post-date the date the patient died. Often, this is because the pharmacy has an automatic refill system in place that sends a claim to Medicare, Medicaid, and other insurers, after a certain time period has passed since the prior fill of that prescription. However, whether a prescription is an automatic refill or not, if a patient does not pick up a prescription, the pharmacy is obligated to reverse the claim within a certain time. In my training and experience, pharmacies committing fraud often submit claims for beneficiaries who are already dead and never reverse them. The pharmacies involved in this investigation submitted post-death claims.

51.     The owners/operators of the aforementioned pharmacies submitted false and fraudulent claims through interstate wires from Michigan to Medicare, Medicaid, and other insurers. The claims were processed and adjudicated electronically by CVS Caremark, OptumRx, and Express Scripts, among other PBMs, outside the state of Michigan.

## **PROBABLE CAUSE**

52.     Cooperating Witness 1 ("CW-1") is known to agents and pleaded guilty to conspiracy to commit health care fraud in the Eastern District of Michigan. CW-1 has not yet been sentenced. CW-1 owned a pharmacy and pleaded guilty stemming from a scheme in which CW-1's pharmacy billed for prescriptions that were not dispensed and paid kickbacks to induce beneficiaries to fill their prescriptions at CW-1's pharmacy. Investigators interviewed CW-1 in March 2017 and February 2020. CW-1 provided the following information based on conversations CW-1 had with Abdallah.

53.     CW-1 knows Abdallah. They had multiple conversations, including some as recently as 2016, about their respective pharmacies and the fraud schemes they were each engaged in. Abdallah told CW-1 that Abdallah owned Conner, Eastside, a pharmacy near Wayne State University, a pharmacy in Ohio that he had sold, another pharmacy that he opened in Ohio, and another pharmacy on Gratiot Avenue next to Dr. Eduardo Abellana's ("Dr. Abellana") office. CW-1 also stated that City Drugs sounded familiar as a pharmacy that Abdallah owned. I know from records I have reviewed in this case that Wayne Campus is located near Wayne State University, and that Abdallah sold his interest in a pharmacy in Ohio in approximately 2012 or 2013 and subsequently opened a different pharmacy in Ohio.

54.     Abdallah told CW-1 that Abdallah partnered with different individuals for his pharmacies, including Hamaed and individuals named Tarek and Auday,

which are Fakhuri and Maki's first names, respectively. Abdallah told CW-1 that Abdallah submitted claims for prescriptions that he did not dispense and submitted claims for automatic refills even if the patient did not want the medication. Abdallah stated that if his pharmacies were audited, he would be in trouble. Abdallah stated that he tried to conceal his shortages by keeping enough inventory and invoices to cover an invoice review by the PBM for which the pharmacy billed through the most.

55.     Abdallah also told CW-1 that he sold opioid prescriptions for cash.

56.     Cooperating Witness 2 ("CW-2"), a relative of CW-1, is known to agents and pleaded guilty to conspiracy to commit health care fraud in the Eastern District of Michigan. CW-2 has not yet been sentenced. CW-2 owned a pharmacy and worked at a different pharmacy and pleaded guilty stemming from a scheme in which these pharmacies billed for prescriptions that were not dispensed and paid kickbacks to induce beneficiaries to fill their prescriptions these pharmacies. Investigators interviewed CW-2 in March 2017 and February 2020 and CW-2 provided the following information based on conversations CW-2 had with Abdallah.

57.     CW-2 knows Abdallah. They had multiple conversations between 2010 and 2014 about their respective pharmacies and the fraud schemes they were each engaged in. Abdallah told CW-2 that Abdallah partnered with different individuals for his pharmacies, including Hamaed, Fakhuri, and Maki. Abdallah stated that he

owned Conner, Eastside, a pharmacy by Wayne State University, and another pharmacy in a doctor's office. As stated above, City Drugs was located next to Dr. Abellana's office. Abdallah told CW-2 that Abdallah submitted claims for prescriptions that he did not dispense and submitted claims for automatic refills even if the patient did not want the medication without reversing the claims. Abdallah stated that if his pharmacies were audited, he would be in trouble. Abdallah stated that he tried to conceal his shortages by keeping enough inventory and invoices to cover an invoice review by the largest PBM. He told his partners to do this as well. Abdallah stated that he filled narcotics prescriptions for cash; whether he did this at all of his pharmacies or only a subset is not known at this time. Abdallah stated that he closed and opened pharmacies on multiple occasions to avoid detection.

58.     Abdallah also discussed with CW-2 the amount for which he could sell opioid prescriptions in cash.

## Heartland

Qlarant Invoice Reconciliation

59.     Investigators requested drug purchase records and received responses from the pharmaceutical wholesalers used by Heartland, which are listed below. An FBI agent and I furnished all of the wholesaler records and Medicare and Medicaid data received to Qlarant and requested an invoice review for the period of December 4, 2012 through June 4, 2019. Qlarant compared invoices for Heartland's drug

purchases to Medicare and Medicaid claims data for this period.

60.    On November 22, 2019, Qlarant provided the following summary of its invoice review:

> **Wholesalers with Supportive Invoices:** Akron, Alpine, Anda, Auburn, Bonita, Cardinal, DTR Medical, Fagron, H&H Wholesaler, Health Source, Independent, Ixthus, Letco Medical, Masters, McKesson, Medmax, Miami Luken, Nephron, NuMed, Paragon, ParMed, Pharmsource, Praxis, Prescription Supply, PriMed, Redmond & Greer, Republic, River City, Smith Drug and Integral, South Pointe, Taiga, and Wasatch
>
> **Date Range of Invoice Review:** 12/04/2012 – 6/04/2019
>
> **Number of Drugs Reviewed:** 179
>
> **Total Number of Drugs Short to Medicare:** 55
>
> **Total Number of Drugs Short to Medicaid:** 4
>
> **Approximate Loss to Medicare:** $661,857.23
>
> **Approximate Loss to Medicaid:** $28,731.69
>
> **Approximate Combined Loss to Medicare and Medicaid:** $690,588.92

61.    Qlarant provided the following summary of Heartland's top ten drug shortages by approximate combined loss to Medicare and Medicaid:

| Drug Name | Approx. Dollar Loss |
|---|---|
| Novolog Inj Flexpen | $97,403.51 |
| Metformin Tab 1000 ER | $66,818.75 |
| Lantus Solos Inj 100/ML | $58,232.55 |
| Seroquel XR Tab 300 MG | $45,834.94 |
| Abilify Tab 10 MG | $45,275.24 |
| Budesonide Cap 3 MG DR | $29,617.53 |
| Abilify Tab 20 MG | $27,561.16 |

| Drug Name | Approx. Dollar Loss |
|---|---|
| Creon Cap 24000 UNT | $25,464.72 |
| Renvela Pow 2.4 GM | $24,067.49 |
| Humulin R Inj U-500 | $23,120.56 |

62.    In sum, Qlarant concluded that Heartland's inventory of prescription drugs was not sufficient to support its claim submissions to Medicare and Medicaid for at least 55 of the 179 drugs selected for the analysis. Based upon the shortage detected, Qlarant concluded that Medicare and Medicaid paid Heartland approximately $690,588.92 for medications that Heartland did not have sufficient inventory to dispense. The shortage drugs that caused the highest dollar loss were Novolog Inj Flexpen, Metformin Tab 1000 ER, and Lantus Solos Inj 100/ML.

Beneficiary Interview

63.    In December 2019, An FBI agent and I interviewed S.H., a Medicare beneficiary who picked up prescriptions at Heartland. Claims data reflects prescriptions purportedly dispensed to S.H. from at least 2013 to 2018. S.H. identified Ghussin as the pharmacist and owner of Heartland. S.H. stated that s/he did not receive all of the medication that Heartland billed to his/her Medicare insurance.

64.    For example, S.H. only received Metformin Tab 500 mg ER from Heartland and stated that s/he never received Metformin Tab 1000 mg ER from Heartland. However, between September 2014 and February 2018, Heartland billed S.H.'s Medicare insurance for Metformin Tab 1000 mg ER approximately 15 times.

Metformin Tab 1000 mg ER is one of the top shortage medications that Qlarant identified. S.H. surmised that Ghussin billed his/her Medicare insurance for Metformin Tab 1000 mg ER, but dispensed Metformin Tab 500 mg ER.

65.    As a second example, S.H. stated that s/he never received Chantix from Heartland because s/he was afraid to take Chantix due to already taking anti-depressants. However, between October 2016 and May 2017, Heartland billed S.H.'s Medicare insurance for Chantix approximately eight times.

## **Heartland 2**

Qlarant Invoice Reconciliation

66.    An FBI agent and I requested drug purchase records and received responses from the pharmaceutical wholesalers used by Heartland 2, which are listed below. An FBI agent and I furnished all of the wholesaler records and Medicare and Medicaid data received to Qlarant and requested an invoice review for the period of December 15, 2012 through June 4, 2019. Qlarant compared invoices for Heartland 2's drug purchases to Medicare and Medicaid claims data for this period.

67.    On November 22, 2019, Qlarant provided the following summary of its invoice review:

> **Wholesalers with Supportive Invoices:** Alpine, Anda, Bonita, Cardinal/Harvard Drug, Fagron, Health Source, Ixthus, Keysource/ Praxis, Masters, McKesson, Miami Luken, Parmed/ Gensource, Pharmsource, Redmond and Greer, Republic, River City, Smith Drug and Integral, South Point, Taiga, and Wasatch.
> **Date Range of Invoice Review:** 12/15/2012 – 06/04/2019

**Number of Drugs Reviewed:** 101

**Total Number of Drugs Short to Medicare:** 43

**Total Number of Drugs Short to Medicaid:** 4

**Approximate Loss to Medicare:** $378,885.27

**Approximate Loss to Medicaid:** $16,098.20

**Approximate Combined Loss to Medicare and Medicaid:** $394,983.47

68.    Qlarant provided the following summary of Heartland 2's top ten drug shortages by approximate combined loss to Medicare and Medicaid:

| Drug Name | Approx. Dollar Loss |
|---|---|
| Betaseron Inj 0.3 MG | $78,781.42 |
| Opana ER Tab 40 MG | $30,506.21 |
| Creon Cap 24000 UNT | $26,711.94 |
| Spiriva Cap Handihlr | $24,019.15 |
| Latuda Tab 40 MG | $23,005.97 |
| Latuda Tab 20 MG | $21,226.51 |
| Latuda Tab 120 MG | $18,745.35 |
| Lantus Solos Inj 100/ML | $16,544.91 |
| Lidocaine Pad 5% | $16,489.45 |
| Advair Disku Aer 250/50 | $14,624.75 |

69.    In sum, Qlarant concluded that Heartland 2's inventory of prescription drugs was not sufficient to support its claim submissions to Medicare and Medicaid for at least 43 of the 101 drugs selected for the analysis. Based upon the shortage detected, Qlarant concluded that Medicare and Medicaid paid Heartland 2 approximately $394,983.47 for medications that Heartland 2 did not have sufficient inventory to dispense. The shortage drugs that caused the highest dollar loss were

Betaseron Inj 0.3 MG, Opana ER Tab 40 MG, and Creon Cap 24000 UNT.

Beneficiary Interview

70.     In December 2019, An FBI agent and I interviewed C.M., a Medicare beneficiary who picked up prescriptions at Heartland 2. Claims data reflects prescriptions purportedly dispensed to C.M. from at least 2013 to 2018. C.M. identified Ghussin as the pharmacist at Heartland and as a fill in pharmacist at Heartland 2. C.M. stated that s/he did not receive all of the medication that Heartland 2 billed to his/her Medicare insurance.

71.     For example, C.M. recalled that s/he received inhalers from Heartland 2, but only received one brand of inhaler in a given month. C.M. did not receive a Proair inhaler and a Dulera inhaler in the same month. However, C.M. was billed for both a Dulera inhaler and a Proair inhaler in March 2014, May 2014, June 2014, and July 2014.

## City Drugs

Qlarant Invoice Reconciliation

72.     Investigators requested drug purchase records and received responses from the pharmaceutical wholesalers used by City Drugs, which are listed below. Investigators furnished all of the wholesaler records and Medicare and Medicaid data that was received to Qlarant and requested an invoice review for the period of January 1, 2011 through February 5, 2018. Qlarant compared invoices for City

Drugs' drug purchases to Medicare and Medicaid claims data for this period.

73.    On April 30, 2018, Qlarant provided the following summary of its invoice review:

**Wholesalers with Supportive Invoices:** Anda, Cardinal Health-Harvard Drug Group, Cardinal Health-ParMed, and McKesson

**Date Range of Invoice Review:** 1/1/2011 – 2/5/2018

**Number of Drugs Reviewed:** 55

**Total Number of Drugs Short to Medicare:** 53

**Total Number of Drugs Short to Medicaid:** 35

**Approximate Loss to Medicare:** $2,097,515.71

**Approximate Loss to Medicaid:** $1,598,038.72

**Approximate Combined Loss to Medicare and Medicaid:** $3,695,554.43.

74.    Qlarant provided the following summary of City Drugs' top ten drug shortages by approximate combined loss to Medicare and Medicaid:

| Drug Name | Approx. Dollar Loss |
|---|---|
| Aug Betamet Oin 0.05% | $470,539.14 |
| QVAR AER 80MCG | $404,986.69 |
| Advair Disku Aer 250/50 | $312,128.60 |
| QVAR Aer 40MCG | $242,648.93 |
| Lyrica Cap 75MG | $234,808.72 |
| Spiriva Cap handihlr | $212,459.12 |

| Drug Name | Approx. Dollar Loss |
|---|---|
| Abilify Tab 5MG | $174,927.31 |
| Lantus Inj 100/ml | $152,177.48 |
| Symbicort Aer 160-4.5 | $150,730.51 |
| Triumeq Tab | $135,948.68 |

75.    In sum, Qlarant concluded that City Drugs' inventory of prescription drugs was not sufficient to support its claim submissions to Medicare and Medicaid for at least 53 of the 55 drugs selected for the analysis. Based upon the shortage detected, Qlarant concluded that Medicare and Medicaid paid City Drugs approximately $3,695,554.43 for medications that City Drugs did not have sufficient inventory to dispense. The shortage drugs that caused the highest dollar loss were Augmented Betamethasone Ointment, QVAR (inhaler), Advair Disku (inhaler), and Lyrica.

BCBS Shortage at City Drugs

76.    On May 30, 2018, based on the Medicare and Medicaid shortage medications identified by Qlarant, BCBS provided a financial impact letter indicating that BCBS paid $42,872.61 in claims submitted by City Drugs for those shortage medications over the same period as Qlarant's analysis.

Billing for Deceased Beneficiaries at City Drugs

77.    Investigators conducted a review of the Medicare Part D claims data

and Medicaid claims data for City Drugs, which revealed that City Drugs billed for medication purportedly dispensed to beneficiaries after they were deceased. Between approximately 2011 and January 2016, City Drugs submitted 13 claims for medications purportedly dispensed to beneficiaries after their dates of death.

Beneficiary Interview

78.    In November 2019 and January 2020, P.M., a Medicaid beneficiary who picked up prescriptions at City Drugs, was interviewed by investigators. Claims data reflects P.M. purportedly received prescriptions from 2010 to 2012 and 2016 to 2018. P.M. identified Maki as the pharmacist at City Drugs. P.M. stated that s/he did not receive all of the medication that City Drugs billed to his/her Medicaid insurance.

79.    For example, P.M. only received Lyrica once. It had severe side effects the first time P.M. took it so s/he never took it again. However, between April 2016 and March 2018, City Drugs billed P.M.'s Medicaid insurance for Lyrica approximately 19 times. Lyrica is one of the shortage medications that Qlarant identified.

80.    As a second example, P.M. stated that s/he only needed an Albuterol inhaler but received others from City Drugs that s/he did not need. P.M. received about six or seven inhalers in 2018. However, in 2018, City Drugs actually billed P.M.'s Medicaid insurance for 18 inhalers. Approximately half of City Drugs' top ten shortage medications are inhalers.

81.     As a third example, P.M. stated that s/he never received Acyclovir. Nevertheless, between May 2016 and May 25, 2018, City Drugs billed P.M.'s Medicaid insurance for Acyclovir approximately 19 times, with Dr. Abellana listed as the prescribing physician. P.M. recalled that Dr. Abellana did initially prescribe it but, before P.M. picked it up, P.M. looked it up and saw that it was for herpes. P.M. saw another doctor who stated that P.M. did not have herpes. P.M. subsequently confronted Dr. Abellana. S/he did not pick up the medication from City Drugs.

## PMC

82.     Evidence obtained during the course of the investigation supports that Dr. Abellana is part of the fraud scheme described in this affidavit. As stated above, Dr. Abellana's office used to be located next to City Drugs. MDHHS-OIG determined that, from January 2009 to September 2015, Dr. Abellana was responsible for 75% of all prescriptions filled at City Drugs. When City Drugs closed, Maki opened Park Med Pharmacy in the same building as PMC. According to information that PMC provided to Medicare through the Provider Enrollment, Chain, and Ownership System, the PMC location next to City Drugs closed in or around October 2017. The PMC location next to Park Med Pharmacy opened earlier in 2017. According to data that the investigators reviewed, from July 2017 through June 2019, Dr. Abellana was responsible for prescriptions constituting approximately 66% of the amount that Park Med Pharmacy received from Medicare.

In this same period, the next two pharmacies that received the greatest amount of Medicare reimbursements from Dr. Abellana's prescriptions were Conner and another pharmacy that Maki incorporated.

83.  As noted above, information provided to Medicare stated that Dr. Abellana is practicing in Subject Premises 2B. In addition, I called PMC on February 20, 2020 and verified that Dr. Abellana practices at Subject Premises 2B. The individual investigators spoke to at PMC also confirmed that Dr. Abellana's old practice address was 11180 Gratiot Ave., Detroit, Michigan.

84.  CW-2 stated that Abdallah told him/her that Abdallah paid kickbacks to Dr. Abellana of $5 per prescription.

85.  As stated above, Dr. Abellana prescribed Conner patient P.M. Acyclovir, which was medically unnecessary and never filled. Nevertheless, Conner submitted 19 claims for Acyclovir, which Dr. Abellana noted as the prescribing doctor in the claims data.

86.  Medicaid beneficiary K.M. was interviewed in December 2019 and January 2020. K.M. stated that s/he used to get prescriptions filled at City Drugs. Claims data indicates that K.M. purportedly received prescriptions from City Drugs in 2010, 2012, and 2014 to 2018. K.M. stated that s/he had never saw Dr. Abellana and never received any of the prescriptions allegedly written by Dr. Abellana as set forth in City Drugs' claims data. City Drugs' claims data shows 54 prescriptions

supposedly written by Dr. Abellana and filled between May 2010 and January 2018.

87.     Medicare beneficiary L.S. was a patient of Dr. Abellana, City Drugs, and Park Med Pharmacy. Claims data indicates that L.S. purportedly received prescriptions from City Drugs from 2011 to 2018, including with Dr. Abellana as the prescribing doctor in 2011 and from 2013 to 2018, and from Park Med Pharmacy from 2018 to 2019, including with Dr. Abellana as the prescribing doctor in 2018 and 2019. L.S. is P.M.'s significant other. L.S. stated that when he was at City Drugs, Dr. Abellana called the pharmacist at City Drugs to tell the pharmacist what to fill. L.S. was not part of this conversation. L.S. subsequently received medication s/he did not want or need, including inhalers, which L.S. told Maki. Moreover, L.S. continued to receive medications s/he did not need, some of which he returned to the pharmacy. These claims were not reversed. L.S.'s insurance was also billed for medication that L.S. never received, including inhalers, and Lyrica.

88.     Investigators reviewed L.S.'s Medicare data and confirmed that Dr. Abellana was the prescribing doctor for the vast majority of L.S.'s prescriptions at City Drugs from February 2013 to January 2018 and at Park Med Pharmacy from August 2018 to October 2019.

## Eastside

### Qlarant Invoice Reconciliation

89.     Investigators requested drug purchase records and received responses

from the pharmaceutical wholesalers used by Eastside, which are listed below. I furnished all of the wholesaler records received to Qlarant and requested an invoice review for the period of January 3, 2011 through April 22, 2016. Qlarant compared invoices for Eastside's drug purchases to Medicare and Medicaid claims data for this period.

90.   On May 2, 2018, Qlarant finalized its invoice review of Eastside and provided the following summary:

**Wholesalers with Supportive Invoices:** Anda, Auburn, Cardinal Health-Harvard Drug Group, Cardinal Health-ParMed, Match Rx, McKesson, Quest, and Trxade

**Date Range of Invoice Review:** 1/3/2011 – 4/22/2016

**Number of Drugs Reviewed:** 109

**Total Number of Drugs Short to Medicare:** 79

**Total Number of Drugs Short to Medicaid:** 14

**Approximate Loss to Medicare:** $2,079,423.21

**Approximate Loss to Medicaid:** $396,481.88

**Approximate Combined Loss to Medicare and Medicaid:** $2,475,905.09.

91.   Qlarant provided the following summary of Eastside's top ten drug shortages by approximate combined loss to Medicare and Medicaid:

| Drug Name | Approx. Dollar Loss |
|---|---|
| Abilify Tab 10 Mg | $393,488.36 |

| Drug Name | Approx. Dollar Loss |
|---|---|
| Spiriva Cap handihlr | $237,323.21 |
| Advair Disku Aer 250/50 | $195,705.69 |
| Renvela Tab 800 Mg | $133,315.15 |
| Seroquel XR Tab 300 Mg | $107,694.04 |
| Symbicort Aer 160-4.5 | $95,233.55 |
| Abilify Tab 5MG | $71,275.48 |
| Lantus Inj 100/ml | $70,590.37 |
| Abilify Tab 15 Mg | $64,727.63 |
| Seroquel XR Tab 200 Mg | $64,475.56 |

92.    In sum, Qlarant concluded that Eastside's inventory of prescription drugs was not sufficient to support its claim submissions to Medicare and Medicaid for at least 79 of the 109 drugs selected for the analysis. Based upon the shortage detected, Qlarant concluded that Medicare and Medicaid paid Eastside approximately $2,475,905.09 for medications that Eastside did not have sufficient inventory to dispense. The shortage drugs that caused the highest dollar loss were Abilify, Spiriva Can Handihlr (inhaler), Advair Disku (inhaler), and Renvela.

BCBS Shortage for Eastside

93.    On May 30, 2018, based on the Medicare and Medicaid shortage medications identified by Qlarant, BCBS provided a financial impact letter indicating that BCBS paid $196,910.15 in claims submitted by Eastside for those

shortage medications over the same period as Qlarant's analysis.

Billing for Deceased Beneficiaries at Eastside

94.    Investigators conducted a review of the Medicare Part D claims data and Medicaid claims data for Eastside, which revealed that Eastside billed for medication purportedly dispensed to beneficiaries after they were deceased. Between approximately January 2010 and December 2015, Eastside submitted 145 claims for medications purportedly dispensed to beneficiaries after their dates of death.

Beneficiary Interview

95.    In October 2019 and January 2020, D.R., a Medicare beneficiary who picked up prescriptions at Eastside, was interviewed by investigators. Claims data reflects prescriptions supposedly dispensed to D.R. from at least 2011 until the spring of 2016. D.R. identified Abdallah as the owner and person who ran Eastside. D.R. stated that s/he did not receive all of the medication that Eastside billed to his/her Medicare and Medicaid insurance.

96.    As an example, D.R. stated that s/he switched from Advair to Spiriva at some point and never received both of them at the same time. D.R. stated that if s/he were billed for both, D.R. did not receive the Advair. D.R.'s Medicare data indicates that Eastside submitted claims for Advair monthly from February 2011 to October 2011 and then Spiriva monthly from August 2014 to March 2016. In February 2015, Eastside resumed submitting claims for Advair, which D.R. did not receive.

Qlarant's shortage analysis identified Advair as one of Eastside's largest shortage medications.

97.    As another example, D.R. stated that s/he did not receive Proair inhalers. Nevertheless, from January 2011 to March 2016, Eastside submitted claims for 64 Proair inhalers. Qlarant identified Proair as a shortage medication at Eastside.

**Universal**

Michigan Medicaid Invoice Reconciliation

98.    In 2016, the Michigan Department of Health and Human Services— Office of Inspector General ("MDHHS-OIG") conducted an invoice review of Universal for the period January 1, 2013, through January 31, 2016. MDHHS-OIG's invoice review compared Universal's drug purchases to its Medicaid billing for this period. MDHHS-OIG determined that Universal had a shortage of a number of medications that resulted in a loss to Medicaid of $262,421.31. MDHHS-OIG typically reviews only claims submitted to Medicaid and not to Medicare.

Qlarant Invoice Reconciliation

99.    During the MDHHS-OIG invoice review, Universal told MDHHS-OIG which pharmaceutical wholesalers it used. MDHHSOIG provided me with Universal's drug purchase records utilized in its invoice review of Universal for the above-stated period.

100.   The records provided by MDHHS-OIG contained drug sale or purchase

records from the pharmaceutical wholesalers listed below.

101.   Investigators furnished all of the wholesaler records received to Qlarant and requested an invoice review for the period of January 2, 2013, through January 29, 2016. Qlarant compared invoices for Universal's drug purchases to both Medicare and Medicaid claims data for this period.

102.   On November 2, 2018, Qlarant finalized its invoice review of Universal and concluded the following:

> **Wholesalers with Supportive Invoices:** Anda (VIP), Auburn Pharmaceutical, H&H Wholesale, Harvard Drug Group, Keysource, Masters Rx, Match Rx, McKesson, Payless Distributors, and Top Rx
>
> **Date Range of Invoice Review:** 1/2/2013 – 01/29/2016
>
> **Number of Drugs Reviewed:** 81
>
> **Total Number of Drugs Short to Medicare:** 64
>
> **Total Number of Drugs Short to Medicaid:** 7
>
> **Approximate Loss to Medicare:** $1,236,281.05
>
> **Approximate Loss to Medicaid:** $168,873.48
>
> **Approximate Combined Loss to Medicare and Medicaid:** $1,405,154.53

103.   Qlarant provided the following summary of Universal's top ten drug shortages by approximate combined loss to Medicare and Medicaid:

| Drug Name | Approx. Dollar Loss |
|---|---|
| Lidocaine Oin 5% | $193,156.01 |

| Drug Name | Approx. Dollar Loss |
|---|---|
| Lidoderm Dis 5% | $112,441.82 |
| Spiriva Cap Handihlr | $98,631.45 |
| Nexium Cap 40 Mg | $92,624.69 |
| Advair Disku Aer 250/50 | $70,685.50 |
| Lantus inj 100/Ml | $57,935.51 |
| Abilify Tab 5 Mg | $52,959.48 |
| Symbicort Aer 160-4.5 | $52,068.19 |
| Celebrex Cap 200 Mg | $48,831.01 |
| Advair Disku Aer 500/50 | $48,504.79 |

104.   In sum, Qlarant concluded that Universal's inventory of prescription drugs was not sufficient to support its claim submissions to Medicare and Medicaid for at least 64 of the 81 drugs selected for the analysis. Based upon the shortage detected, Qlarant concluded that Medicare and Medicaid paid Universal approximately $1,405,154.53 for medications that Universal did not have sufficient inventory to dispense. The shortage drugs that caused the highest dollar loss were Lidocaine Ointment, Lidoderm Dis, and Spiriva Cap Handihlr (inhaler).

BCBS Shortage for Universal

105.   On May 29, 2019, based on the Medicare and Medicaid shortage medications identified by Qlarant, BCBS provided a financial impact letter indicating that BCBS paid $97,813.54 in claims submitted by Universal for those

shortage medications over the same period as Qlarant's analysis.

<u>Billing for Deceased Beneficiaries at Universal</u>

106.   Investigators conducted a review of the Medicare Part D claims data and Medicaid claims data for Universal, which revealed that Universal billed for medication purportedly dispensed to beneficiaries after they were deceased. Between approximately October 2010 and April 2017, Universal submitted 56 claims for medications purportedly dispensed to beneficiaries after their dates of death.

<u>Beneficiary Interview</u>

107.   In January 2020, investigators interviewed P.H., a Medicare beneficiary who picked up prescriptions at Universal. Claims data reflects that P.H. purportedly received prescriptions form Universal from at least 2013 into 2018, which is the entirety of the period for which the government has Universal's Medicare claims data. P.H. identified Khreizat and Cholag as pharmacists at Universal. P.H. stated that s/he did not receive all of the medication that Universal billed to his/her Medicare insurance.

108.   For example, P.H. identified and showed agents the three inhalers s/he has used. P.H. stated that s/he has never received a Tudorza inhaler, which Universal billed to Medicare 11 times from March 2015 to January 2016. Qlarant did not include Tudorza in its shortage analysis.

109.   As another example, P.H. stated that s/he never received Proair, which

Universal billed to Medicare five times between May 2016 and October 2016. Qlarant identified Proair as a shortage medication for Universal.

110.  As a third example, P.H. stated that s/he never received Ketoconazole, which Universal billed to Medicare ten times from October 2017 to August 2018. Qlarant did not include Ketoconazole in its shortage analysis.

## **Wayne Campus**

### Qlarant Invoice Reconciliation

111.  Investigators requested drug purchase records and received responses from the pharmaceutical wholesalers used by Wayne Campus, which are listed below. Investigators furnished all of the wholesaler records received to Qlarant and requested an invoice review for the period of January 20, 2012 through December 31, 2016. Qlarant compared invoices for Wayne Campus's drug purchases to Medicare and Medicaid claims data for this period.

112.  On February 28, 2020, Qlarant finalized its invoice review of Wayne Campus and provided the following summary:

> **Wholesalers with Supportive Invoices:** Alpine, Auburn, Cardinal, and McKesson
>
> **Date Range of Invoice Review:** 1/20/2012 – 12/31/2016
>
> **Number of Drugs Reviewed:** 85
>
> **Total Number of Drugs Short to Medicare:** 51
>
> **Total Number of Drugs Short to Medicaid:** 2

**Approximate Loss to Medicare:** $324,699.07

**Approximate Loss to Medicaid:** $856.51

**Approximate Combined Loss to Medicare and Medicaid:** $325,555.58.

113.   Qlarant provided the following summary of Wayne Campus's top ten drug shortages by approximate combined loss to Medicare and Medicaid:

| Drug Name | Approx. Dollar Loss |
|---|---|
| Truvada Tab 200-300 | $38,737.72 |
| Spiriva Cap Handihlr | $34,116.76 |
| Renvela Tab 800 Mg | $27,067.43 |
| Reyataz Cap 300 Mg | $24,928.74 |
| Lidoderm Dis 5% | $20,820.00 |
| Symbicort Aer 160-4.5 | $18,522.54 |
| Abilify Tab 10 Mg | $15,074.99 |
| Seroquel XR Tab 400 Mg | $10,012.96 |
| Lantus Solos Inj 100/ml | $9,202.89 |
| Advair Disku Aer 250/50 | $9,130.93 |

114.   In sum, Qlarant concluded that Wayne Campus's inventory of prescription drugs was not sufficient to support its claim submissions to Medicare and Medicaid for at least 51 of the 94 drugs selected for the analysis. Based upon the shortage detected, Qlarant concluded that Medicare and Medicaid paid Wayne Campus approximately $325,555.58 for medications that Wayne Campus did not

have sufficient inventory to dispense. The shortage drugs that caused the highest dollar loss were Truvada, Spiriva Cap Handihlr (inhaler), and Renvela.

Billing for Deceased Beneficiaries at Wayne Campus

115.   Investigators conducted a review of the Medicare Part D claims data and Medicaid claims data for Wayne Campus, which revealed that Wayne Campus billed for medication purportedly dispensed to beneficiaries after they were deceased. Between approximately January 2012 and March 2018, Wayne Campus submitted 58 claims for medications purportedly dispensed to beneficiaries after their dates of death.

Beneficiary Interview

116.   In January 2020, investigators interviewed B.B., a Medicaid beneficiary who filled his/her prescriptions at Wayne Campus. Claims data reflects prescriptions supposedly dispensed to B.B. since at least 2014. B.B. identified Abdelrazzaq as the pharmacist at Wayne Campus. B.B. stated that s/he did not receive all of the medication that Wayne Campus billed to his/her Medicaid insurance.

117.   B.B. stated that s/he knew which medications s/he received and s/he knew s/he did not receive all of the medications Wayne Campus billed to Medicaid. B.B. stated that s/he never received Dulera or QVAR inhalers from Wayne Campus. Nevertheless, in June 2015, Wayne Campus submitted a claim for a Dulera inhaler and, in July 2015, Wayne Campus submitted a claim for a QVAR inhaler.

## Conner

### Qlarant Invoice Reconciliation

118.  Investigators requested drug purchase records and received responses from the pharmaceutical wholesalers used by Conner, which are listed below. Investigators furnished all of the wholesaler records received to Qlarant and requested an invoice review for the period of April 18,2016 through September 12, 2019. Qlarant compared invoices for Conner's drug purchases to Medicare and Medicaid claims data for this period.

119.  On February 28, 2020, Qlarant finalized its invoice review of Conner and provided the following summary:

**Wholesalers with Supportive Invoices:** Alpine Health, Alvix Laboratories LLC, Amerisource Bergen, Anda, Atlantic, Auburn, Bellco, Bonita, Cardinal, Dynasty, H&H, IPC, KY Meds, Masters, Match Rx, Matrix, McKesson, Pharmasource, Prescription Supply, PriMed, Quest, River City, South Pointe, Wasatch, and Wellgistics.

**Date Range of Invoice Review:** 4/18/2016 – 9/12/2019

**Number of Drugs Reviewed:** 77

**Total Number of Drugs Short to Medicare:** 35

**Total Number of Drugs Short to Medicaid:** 0

**Approximate Loss to Medicare:** $96,764.88

**Approximate Loss to Medicaid:** $0.00

**Approximate Combined Loss to Medicare and Medicaid:** $96,764.88

120.   Qlarant provided the following summary of Conner's top ten drug shortages by approximate combined loss to Medicare and Medicaid:

| Drug Name | Approx. Dollar Loss |
|---|---|
| Abilify Main Inj 400mg | $12,821.08 |
| Spiriva Cap Handihlr | $6,596.42 |
| Humalog Mix Inj 75/25kwp | $6,176.16 |
| Renvela Tab 800mg | $5,420.41 |
| Advair Disku Aer 500/50 | $5,362.41 |
| Invega Sust Inj 234/1.5 | $5,244.08 |
| Advair Disku Aer 250/50 | $4,868.99 |
| Enbrel Srclk Inj 50mg/ml | $4,818.91 |
| Seroquel XR Tab 300mg | $4,813.47 |
| Aripiprazole Tab 10mg | $3,996.78 |

121.   In sum, Qlarant concluded that Conner's inventory of prescription drugs was not sufficient to support its claim submissions to Medicare and Medicaid for at least 35 of the 77 drugs selected for the analysis. Based upon the shortage detected, Qlarant concluded that Medicare and Medicaid paid Conner approximately $96,764.88 for medications that Conner did not have sufficient inventory to dispense. The shortage drugs that caused the highest dollar loss were Abilify Main Inj 400 mg, Spriva Cap Handihlr (inhaler), and Humalog Mix Inj (HIV medication).

Billing for Deceased Beneficiaries at Conner

122.    Investigators conducted a review of the Medicare Part D claims data and Medicaid claims data for Conner, which revealed that Conner billed for medication purportedly dispensed to beneficiaries after they were deceased. During 2018, Conner submitted four claims for medications purportedly dispensed to a beneficiary after his/her date of death.

Beneficiary Interview

123.    D.R., the Medicare beneficiary discussed with regard to Eastside, became a patient of Conner once Eastside closed in 2016. Claims data reflects that D.R. supposedly received prescriptions from Conner from 2016 to 2019, the end of the period for which the government has claims data. D.R. stated that the same individuals worked at Conner as at Eastside. D.R. stated that, like at Eastside, D.R. did not receive all of the medication that Conner billed to his/her Medicare insurance.

124.    As an example, even though D.R. stated that s/he never received Proair, from April 2016 to July 2019, Conner submitted 35 claims to Medicare.

125.    As another example, in October 2019, D.R. reviewed with me his/her Medicare Explanation of Benefits form from the previous month, September 2019, which listed all of the medications for which Conner had submitted claims to Medicare. D.R. identified multiple medications s/he did not receive, including Lidocaine cream and an Albuterol inhaler.

## St. Clair

### Qlarant Invoice Reconciliation

126.   Investigators requested drug purchase records and received responses from the pharmaceutical wholesalers used by St. Clair, which are listed below. Investigators furnished all of the wholesaler records received to Qlarant and requested an invoice review for the period of March 4, 2018 through September 12, 2019. Qlarant compared invoices for St. Clair's drug purchases to Medicare and Medicaid claims data for this period.

127.   On November 22, 2019, Qlarant finalized its invoice review of St. Clair and provided the following summary:

**Wholesalers with Supportive Invoices:** Akron, Amerisource Bergen, Auburn, Bonita, Cardinal, Colossal Health, Dynasty, H&H, Hercules, Independent, Masters, McKesson, Medmax, Paragon, Pharmox, Prescription Supply, PriMed, Quest, Republic, River City, Smith Drug and Integral, South Pointe, Taiga, Wasatch, and Wellgistics.

**Date Range of Invoice Review:** 3/04/2018 – 9/12/2019

**Number of Drugs Reviewed:** 33

**Total Number of Drugs Short to Medicare:** 9

**Total Number of Drugs Short to Medicaid:** 1

**Approximate Loss to Medicare:** $83,961.88

**Approximate Loss to Medicaid:** $2,138.38

**Approximate Combined Loss to Medicare and Medicaid:** $86,100.26.

128.   Qlarant provided the following summary of St. Clair's top drug shortages by approximate combined loss to Medicare and Medicaid:

| Drug Name | Approx. Dollar Loss |
|---|---|
| Hydrocortiso Oin Absorbas | $54,528.73 |
| Doxepin Hcl Cre 5% | $11,170.18 |
| Omepra/Bicar Cap 40-1100 | $8,059.92 |
| Enbrel Srclk inj 50 Mg/Ml | $5,119.96 |
| Vimpat Tab 100 Mg | $2,723.14 |
| Symbicort Aer 160-4.5 | $1,688.74 |
| Xarelto Tab 15 Mg | $1,238.61 |
| Diclofenac Gel 3% | $1,038.36 |
| Oxymorphone Tab 15 Mg ER | $532.62 |

129.   In sum, Qlarant concluded that St. Clair's inventory of prescription drugs was not sufficient to support its claim submissions to Medicare and Medicaid for at least nine of the 33 drugs selected for the analysis. Based upon the shortage detected, Qlarant concluded that Medicare and Medicaid paid St. Clair approximately $86,100.26 for medications that St. Clair did not have sufficient inventory to dispense. The shortage drugs that caused the highest dollar loss were Hydrocortisone Oin Absorbas, Doxepin Hcl, and Omepra/Bicar Cap.

BCBS Shortage for St. Clair

130.   On December 10, 2019, based on the Medicare and Medicaid shortage

medications identified by Qlarant, BCBS provided a financial impact letter indicating that BCBS paid $2,826.78 in claims submitted by St. Clair for those shortage medications over the same period as Qlarant's analysis.

Beneficiary Interview

131.    In March 2020, investigators interviewed a D.A., a Medicare beneficiary who picked up prescriptions at St. Clair. Claims data reflects that D.A. purportedly received prescriptions from St. Clair in 2018 and 2019. D.A. identified Reslan as the pharmacist at St. Clair. D.A. stated that s/he did not receive all of the medication that St. Clair billed to his/her Medicare insurance.

132.    As an example, D.A. stated that s/he never received Hydrocortisone in Absorbase, an ointment, from St. Clair. Nevertheless, from April 2018 to October 2018, St. Clair submitted five claims for Hydrocortisone in Absorbase, for which Medicare paid approximately $1,069.50 per prescription. Qlarant identified this as St. Clair's top shortage medication.

## Park Med Pharmacy

### Qlarant Invoice Reconciliation

133.    Investigators requested drug purchase records and received responses from the pharmaceutical wholesalers used by Park Med Pharmacy, which are listed below. Investigators furnished all of the wholesaler records received to Qlarant and requested an invoice review for the period of July 2, 2018 through October 11, 2019.

Qlarant compared invoices for Park Med Pharmacy's drug purchases to Medicare and Medicaid claims data for this period.

134.   On December 12, 2019, Qlarant finalized its invoice review of Park Med Pharmacy and provided the following summary:

**Wholesalers with Supportive Invoices:** Anda, Capital, Cardinal, Global, Independent, IPC, Keysource, McKesson, Pharmasource, Redmond and Greer, and Surplus Diabetic.

**Date Range of Invoice Review:** 7/02/2018 – 10/11/2019

**Number of Drugs Reviewed:** 23

**Total Number of Drugs Short to Medicare:** 4

**Total Number of Drugs Short to Medicaid:** 1

**Approximate Loss to Medicare:** $8,487.41

**Approximate Loss to Medicaid:** $3,474.67

**Approximate Combined Loss to Medicare and Medicaid:** $11,962.09

135.   Qlarant provided the following summary of Park Med Pharmacy's top drug shortages by approximate combined loss to Medicare and Medicaid:

| Drug Name | Approx. Dollar Loss |
|---|---|
| HC Valerate Cre 0.2% | $5,684.15 |
| Megestrol AC Sus 40 Mg/Ml | $4,668.35 |
| Lidocaine Oin 5% | $1,383.69 |
| Lyrica Cap 200 Mg | $225.90 |

136.   In sum, Qlarant concluded that Park Med Pharmacy's inventory of prescription drugs was not sufficient to support its claim submissions to Medicare and Medicaid for at least four of the 23 drugs selected for the analysis. Based upon the shortage detected, Qlarant concluded that Medicare and Medicaid paid Park Med Pharmacy approximately $11,962.09 for medications that Park Med Pharmacy did not have sufficient inventory to dispense. The shortage drugs that caused the highest dollar loss were HC Valerate Cre 0.2%, Megestrol AC Sus 40 Mg/Ml, and Lidocaine Oin 5%.

Billing for Deceased Beneficiaries at Park Med Pharmacy

137.   Investigators conducted a review of the Medicare Part D claims data and Medicaid claims data for Park Med Pharmacy, which revealed that Park Med Pharmacy billed for medication purportedly dispensed to beneficiaries after they were deceased. During 2019, Park Med Pharmacy submitted 10 claims for medications purportedly dispensed to a beneficiary after his/her date of death.

Beneficiary Interview

138.   In November 2019 and January 2020, investigators interviewed a L.S., a Medicare beneficiary who picked up prescriptions at Park Med Pharmacy. As stated above, claims data reflects that L.S. purportedly received prescriptions from Park Med Pharmacy in 2018 and 2019. L.S. identified Maki as the pharmacist at Park Med Pharmacy. L.S. stated that s/he did not receive all of the medication that

Park Med Pharmacy billed to his/her Medicare insurance.

139.   As an example, L.S. stated that s/he never received Ketoconazole cream from Park Med Pharmacy. Nevertheless, from August 2018 to October 2019, Park Med Pharmacy submitted 15 claims for Ketoconazole cream.

## PROBABLE CAUSE FOR SEIZURE OF
## FUNDS FROM TARGET ACCOUNTS

140.   As part of this investigation, records were obtained and reviewed for financial involvement relative to allegations of violations of federal law by Kindy Ghussin, Hassan Abdallah, Audi Maki, Hassan Khreizat, Raef Hamaed, Nofal Cholag, and others known and unknown.  Having reviewed multiple accounts, it was determined that the accounts listed below contained proceeds of illegal activity and/or were involved in, or traceable to funds involved in, money laundering.

141.   The following chart lists the accounts identified as receiving fraudulently obtained funds (either directly or indirectly). The charts contain a "Tier" designation column indicating the manner in which the account received Medicare funds or illegal drug proceeds.  Accounts with a "Tier One" designation received cash deposits of illegal drug proceeds or direct deposits of Medicare funds as a result of fraudulently submitted claims by the operators of the respective facilities.  Accounts with a "Tier Two" designation received illegally obtained monies by way of transfer of funds, wire, deposits of checks, interbank transfers, or by withdrawal and deposits from "Tier One" accounts.  Ensuing tiers were

similarly designated.  Additionally, while some accounts could be categorized into multiple tiers, they have been categorized into the lowest tier possible to highlight the most direct flow of illegal funds into the accounts.

### ACCOUNTS REQUESTED FOR SEIZURE

| Financial Institution | Account # | Account Name | Tier |
|---|---|---|---|
| JP Morgan Chase Bank | 473353055 | Heartland Pharmacy 2, LLC | 1 |
| JP Morgan Chase Bank | 464668685 | Heartland Pharmacy, LLC | 1 |
| Bank of America | 375008953994 | Wayne Campus Pharmacy, LLC | 1 |
| Bank of America | 005405242693 | Universal Pharmacy LLC | 1 |
| Key Bank | 327840071176 | Kindy Ghussin | 2 |
| JP Morgan Chase Bank | 2042883021 | Kindy Ghussin | 2 |
| Bank of America | 5961375028 | Hassan Abdullah | 2 |
| Michigan First Credit Union | 15041894 | Auday Maki | 2 |
| Michigan First Credit Union | 10556740 | Auday Maki & Salwa Atwan | 2 |
| JP Morgan Chase Bank | 766261051 | Hassan Khreizat | 2 |
| Bank of America | 375014032993 | Hassan Khreizat | 2 |
| Fifth Third Bank | 7914512301 | Hassan Khreizat | 2 |
| Flagstar Bank | 128170579 | Nofal Cholag | 2 |
| Flagstar Bank | 570421834 | Nofal Cholag | 2 |

| | | | |
|---|---|---|---|
| **TCF National Bank** | **2883080947** | **Nofal Cholag** | **2** |
| **TCF National Bank** | **5444525668** | **Nofal Cholag** | **2** |
| **Bank of America** | **37500823404** | **Raef Hamaed** | **2** |
| **JP Morgan Chase Bank** | **936801232** | **Raef Hamaed** | **2** |
| **Citizens Bank** | **3650366735** | **Raef Hamaed** | **2** |
| **Bank of America** | **375007629106** | **Raef Hamaed** | **2** |
| **Flagstar Bank** | **108125122** | **Ali Abdelrazzaq** | **2** |

### *Tier One Pharmacy Accounts*

**JP Morgan Chase Bank Account No. 473353055,
held in the name of Heartland Pharmacy 2, LLC**

142.   Records from JP Morgan Chase Bank show that Account No. 473353055 is a business checking account held by Heartland Pharmacy 2, LLC. Kindy Ghussin, Hassan Abdallah, and Raef Hamaed are the signatories. The account was opened June 18, 2012.

143.   Records show that JP Morgan Chase Bank Account No. 473353055 is an electronic funds repository account for the receipt of payments for services from Medicare, Medicaid, BCBS, and, as such, it is a Tier One account.

144.   Based on Heartland Pharmacy 2, LLC invoice activity and other records obtained during the investigation for the time period running June 2012

57

through July 2019, the Medicare/Medicaid program reimbursed Heartland Pharmacy 2, LLC through JP Morgan Chase Bank Account No. 473353055, approximately $5.5 million during this time period.

145.   Kindy Ghussin, Hassan Abdallah, and Raef Hamaed as owners and or operators of Heartland Pharmacy 2, LLC certified to PBMs, that the majority of the reimbursements were for claims submitted for reimbursements from Medicare and Medicaid.

146.   Based on the analysis set forth in this affidavit, investigators determined that, Heartland Pharmacy 2, LLC was reimbursed at least $395,000.00 for medications that it did not have sufficient inventory to dispense.

147.   Given the facts obtained during this investigation and set forth herein, there is probable cause to believe that Heartland Pharmacy 2, LLC fraudulently billed the Medicare and Medicaid program for at least $395,000.00, and the funds were deposited into JP Morgan Chase Bank Account No. 473353055. Thus, these funds constitute proceeds of health care fraud, wire fraud, and a conspiracy to commit health care fraud in violation of 18 U.S.C. §§ 1347 and 1349, respectively, and any legitimate funds were commingled with illegitimate funds.

**JP Morgan Chase Bank Account No. 464668685,
held in the name of Heartland Pharmacy, LLC**

148.   Records from JP Morgan Chase Bank show that Account No.

464668685 is a business checking account held by Heartland Pharmacy, LLC. Kindy Ghussin is the signatory. The account was opened on April 27, 2012.

149.   Records show that JP Morgan Chase Bank Account No. 464668685 is an electronic funds repository account for the receipt of payments for services from Medicare, Medicaid, BCBS, and, as such, it is a Tier One account.

150.   Based on Heartland Pharmacy, LLC invoice activity and other records obtained during the investigation for the time period running August 2012 through June 2019, the Medicare/Medicaid program reimbursed Heartland Pharmacy, LLC through JP Morgan Chase Bank Account No. 464668685, approximately $2.3 million during this time period.

151.   Kindy Ghussin, as the owner of Heartland Pharmacy Healthcare, LLC certified to PBMs, that the majority of the reimbursements were for claims submitted for reimbursements from Medicare and Medicaid.

152.   Based on the analysis set forth in this affidavit, investigators determined that Heartland Pharmacy, LLC was reimbursed at least $690,000.00 for medications that it did not have sufficient inventory to dispense.

153.   Given the facts obtained during this investigation and set forth herein, there is probable cause to believe that Heartland Pharmacy, LLC fraudulently billed the Medicare and Medicaid program for at least $690,000.00, and the funds were deposited into JP Morgan Chase Bank Account No. 464668685. Thus, these

funds constitute proceeds of health care fraud, wire fraud, and a conspiracy to commit health care fraud in violation of 18 U.S.C. §§ 1347 and 1349, respectively, and any legitimate funds were commingled with illegitimate funds.

**Bank of America Account No. 375008953994,**
**Held in the Name Wayne Campus Pharmacy, LLC**

154.   Records from Bank America show that Account No. 375008953994 is a business checking account opened on January 4, 2012 and held by Wayne Campus Pharmacy, LLC.  Hassan Abdallah and Ali F. Abdelrazzaq are the signatories.

155.   Records show that Bank of America Account No. 375008953994 is an electronic funds repository account for the receipt of payments for services from Medicare, Medicaid, BCBS, and, as such, it is a Tier One account.

156.   Based on Wayne Campus Pharmacy, LLC invoice activity and other records obtained during the investigation for the time period running June 2011 through July 2018, the Medicare/Medicaid program reimbursed Connor Pharmacy through Bank of America Account No. 375008953994, approximately $2,363.603.00 during this time period.

157.   Hassan Abdallah and Ali F. Abdelrazzaq, as the owners of Wayne Campus Pharmacy, LLC certified to PBMs, that the majority of the reimbursements were for claims submitted for reimbursements from Medicare and

Medicaid.

158. Based on the analysis set forth in this affidavit, investigators determined that Wayne Campus Pharmacy, LLC was reimbursed at least $379,552.58 for medications that it did not have sufficient inventory to dispense.

159. Given the facts obtained during this investigation and set forth herein, there is probable cause to believe that Wayne Campus Pharmacy, LLC fraudulently billed the Medicare and Medicaid program for at least $379,552.58, and the funds were deposited into Bank of America Account No. 375008953994. Thus, these funds constitute proceeds of health care fraud, wire fraud, and a conspiracy to commit health care fraud in violation of 18 U.S.C. §§ 1347 and 1349, respectively, and any legitimate funds were commingled with illegitimate funds.

**Bank of America Account No. 005405242693,
Held in the Name Universal Pharmacy, LLC**

160. Records from Bank America show that Account No. 005405242693 is a business checking account opened on July 26, 2018 and held by Universal Pharmacy, LLC. Hassan Khreizat and Nofal Cholag are the signatories.

161. Records show that Bank of America Account No.005405242693 is an electronic funds repository account for the receipt of payments for services from Medicare, Medicaid, BCBS, and, as such, it is a Tier One account.

162.   Based on Universal Pharmacy, LLC invoice activity and other records obtained during the investigation for the time period running July 28, 2015 through July 2019, the Medicare/Medicaid program reimbursed Universal Pharmacy LLC through Bank of America Account No. 005405242693, approximately $34,078,756.65 during this time period.

163.   Khreizat and Nofal Cholag, as the owners of Universal Pharmacy, LLC certified to PBMs, that the majority of the reimbursements were for claims submitted for reimbursements from Medicare and Medicaid.

164.   Based on the analysis set forth in this affidavit, investigators determined that Universal Pharmacy, LLC was reimbursed at least $1,405,154.53 for medications that it did not have sufficient inventory to dispense.

165.   Given the facts obtained during this investigation and set forth herein, there is probable cause to believe that Universal Pharmacy, LLC fraudulently billed the Medicare and Medicaid program for at least $1,405,154.53, and the funds were deposited into Bank of America Account No. 005405242693.  Thus, these funds constitute proceeds of health care fraud, wire fraud, and a conspiracy to commit health care fraud in violation of 18 U.S.C. §§ 1347 and 1349, respectively, and any legitimate funds were commingled with illegitimate funds.

### _Additional Tier One Accounts Not Sought for Seizure_

**JP Morgan Chase Bank Account No. 453546330,
Held in the name of Waso Healthcare, LLC**

166.   Records from JP Morgan Chase Bank show that Account No. 453546330 is a business checking account opened April 3, 2012 and held by Waso Healthcare, LLC.  Wael Khalifa is its only signatory.

167.   Records show that JP Morgan Chase Bank Account No. 453546330 is an electronic funds repository account for the receipt of payments for services from Medicare, Medicaid, BCBS, and, as such, it is a Tier One account.

168.   Based on Waso Healthcare, LLC invoice activity and other records obtained during the investigation, for the time period running April 2012 through July 2019, the Medicare/Medicaid program reimbursed Waso Healthcare, LLC through JP Morgan Chase Bank Account No. 453546330, approximately $26.1 million during this time period.

169.   Wael Khalifa, as the owner of Waso Healthcare, LLC certified to PBMs, that the majority of the reimbursements were for claims submitted for reimbursements from Medicare and Medicaid.

170.   Based on the analysis set forth in this affidavit, investigators determined that Waso Healthcare, LLC was reimbursed at least $3.8 million for medications that it did not have sufficient inventory to dispense.

171.   Given the facts obtained during this investigation and set forth herein, there is probable cause to believe that Waso Healthcare, LLC fraudulently billed the Medicare and Medicaid program for at least $3.8 million, and the funds were

deposited into JP Morgan Chase Bank Account No. 453546330. Thus, these funds constitute proceeds of health care fraud, wire fraud, and a conspiracy to commit health care fraud in violation of 18 U.S.C. §§ 1347 and 1349, respectively, and any legitimate funds were commingled with illegitimate funds.

**JP Morgan Chase Bank Account No. 658731083,**
**held in the name of Waso Healthcare, LLC**

172.   Records from JP Morgan Chase Bank show that Account No. 658731083 is a business checking account held by Waso Healthcare, LLC.  Wael Khalifa is its only signatory.  The account was opened on October 13, 2014.

173.   Records show that JP Morgan Chase Bank Account No. 658731083 is an electronic funds repository account for the receipt of payments for services from Medicare, Medicaid, BCBS, and, as such, it is a Tier One account.

174.   Based on Waso Healthcare, LLC invoice activity and other records obtained during the investigation, for the time period running October 2014 through July 2019, the Medicare/Medicaid program reimbursed Waso Healthcare, LLC through JP Morgan Chase Bank Account No. 658731083, approximately $1.1million during this time period.

175.   Wael Khalifa, as the owner of Waso Healthcare, LLC certified to PBMs, that the majority of the reimbursements were for claims submitted for reimbursements from Medicare and Medicaid.

176.   Based on the analysis set forth in this affidavit, investigators

determined that Waso Healthcare, LLC was reimbursed at least $300,000.00 for medications that it did not have sufficient inventory to dispense.

177.   Given the facts obtained during this investigation and set forth herein, there is probable cause to believe that Waso Healthcare, LLC fraudulently billed the Medicare and Medicaid program for at least $300,000.00, and the funds were deposited into JP Morgan Chase Bank Account No. 658731083. Thus, these funds constitute proceeds of health care fraud, wire fraud, and a conspiracy to commit health care fraud in violation of 18 U.S.C. §§ 1347 and 1349, respectively, and any legitimate funds were commingled with illegitimate funds.


178.   The following accounts Tier One Accounts although not for seizure, received reimbursements and payments from the Medicare Program for prescriptions drugs they did not have sufficient medication to distribute, then transferred portions of the illegally obtained funds to Tier Two accounts later identified and sought for seizure within this affidavit. The closed Tier One Accounts are identified as follows:

**Middletown Pharmacy, Tier One Wesbanco
Business Account No. 3577009740**.

179.   Records from Wesbanco Bank show that Account No. 3577009740 was a Tier One business checking account opened on March 12, 2007 and held by Middletown Pharmacy Inc. Kindy Ghussin was the sole signatory.

180.    Records show that Wesbanco Bank Account No. 3577009740 was an electronic funds repository account for the receipt of payments for services from Medicare, Medicaid, BCBS, and as such, it was a Tier One Account.

181.    Based on Middletown Pharmacy, Inc. invoice activity, for the time period running February 2011 through January 2018, the Medicaid program reimbursed Middletown Pharmacy, Inc. through Wesbanco Bank Account No. 3577009740, approximately $38,061,840.91 during this time period.

182.    Based on the analysis set forth in this affidavit, Middletown Pharmacy was reimbursed at least $4,051,564.80 for medications that it did not have sufficient inventory to dispense.

183.    Given the facts obtained during this investigation and set forth herein, there is probable cause to believe that Middletown Pharmacy, Inc., fraudulently billed the Medicare and Medicaid program for at least $4,051,564.80, and the funds were deposited into Wesbanco Bank Account No. 3577009740.  Thus, these funds constitute proceeds of health care fraud, wire fraud, and a conspiracy to commit health care fraud in violation of 18 U.S.C. §§ 1347 and 1349, respectively, and any legitimate funds were commingled with illegitimate funds then transferred to several Tier Two Accounts later identified herein.

**Eastside Pharmacy, Tier One Bank of America
Business Account No. 375000285220.**

184.    Records from Bank of America show that Account No.

375000285220 was a Tier One business checking account opened on January 22, 2009 and held by Eastside Pharmacy, Inc.  Raef Hamaed, Hassan Khreizat, and Hassan Abdallah were the listed signatories.

185.   Records show that Bank of America Account No. 375000285220 was an electronic funds repository account for the receipt of payments for services from Medicare, Medicaid, BCBS, and as such, it was a Tier One Account.

186.   Based on Eastside Pharmacy, Inc., invoice activity for the time period running February 2010 through July 2019, the Medicaid program reimbursed Middletown Pharmacy, Inc. through Bank of America Account No. 375000285220, approximately $14,798.727.55 during this time period.

187.   Raef Hamaed, Hassan Khreizat, and Hassan Abdallah as the sole signatories and owners of Eastside Pharmacy, Inc., certified to PBMs, that the majority of the of the reimbursements were for claims submitted from Medicare and Medicaid.

188.   Based on the analysis set forth in this affidavit, Eastside Pharmacy was reimbursed at least $2,475,905.09 for medications that it did not have sufficient inventory to dispense.

189.   Given the facts obtained during this investigation and set forth herein, there is probable cause to believe that Eastside Pharmacy, Inc., fraudulently billed the Medicare and Medicaid program for at least $2,475,905.09, and the funds were

deposited into Bank of America Account No. 375000285220. Thus, these funds constitute proceeds of health care fraud, wire fraud, and a conspiracy to commit health care fraud in violation of 18 U.S.C. §§ 1347 and 1349, respectively, and any legitimate funds were commingled with illegitimate funds then transferred to several Tier Two Accounts later identified herein.

### Connor Pharmacy, Bank of America Tier One
### Business account No. 375015506978.

190. Records from Bank of America show that Account No. 375015506978 is a Tier One business checking account opened on March 25, 2016 and held by Connor Pharmacy, Inc., Hassan Ghoul is the sole signatory.

191. Records show that Bank of America Account No. 375015506978 is an electronic funds repository account for the receipt of payments for services from Medicare, Medicaid, BCBS, and as such, it was a Tier One Account.

192. Based on Connor Pharmacy, Inc., invoice activity for the time period running March 2015 through July 2019, the Medicaid program reimbursed Connor Pharmacy, Inc., through Bank of America Account No. 375015506978, approximately $8,281,600.92 during this time period.

193. Hassan Ghoul as the sole signatory and owner of Connor Pharmacy, Inc., certified to PBMs, that the majority of the reimbursements were for claims submitted from Medicare and Medicaid.

194. Based on the analysis set forth in this affidavit, Connor Pharmacy,

Inc., was reimbursed at least $168,347.06 for medications that it did not have sufficient inventory to dispense.

195.   Given the facts obtained during this investigation and set forth herein, there is probable cause to believe that Connor Pharmacy, Inc., fraudulently billed the Medicare and Medicaid program for at least $168,347.06, and the funds were deposited into Bank of America Account No. 375015506978.  Thus, these funds constitute proceeds of health care fraud, wire fraud, and a conspiracy to commit health care fraud in violation of 18 U.S.C. §§ 1347 and 1349, respectively, and any legitimate funds were commingled with illegitimate funds then transferred to several Tier Two Accounts later identified herein.

## City Drugs Inc., Bank of America Tier One Business Account No. 375000416581.

196.   Records from Bank of America show that Account No. 375000416581 is a Tier One business checking account opened (unknown date) and held by City Drugs Pharmacy Inc.  Auday Maki is the sole signatory.

197.   Records show that Bank of America Account No. 375000416581 is an electronic funds repository account for the receipt of payments for services from Medicare, Medicaid, BCBS, and as such, it was a Tier One Account.

198.   Based on City Drugs Pharmacy, Inc., invoice activity for the time period running March 2011 through November 2019, the Medicaid program reimbursed City Drugs Pharmacy, Inc., through Bank of America Account No.

375000416581, approximately $16,549,171.02 during this time period.

199.    Auday Maki as the sole signatory and owner of City Drugs Pharmacy, Inc., certified to PBMs, that the majority of the reimbursements were for claims submitted from Medicare and Medicaid.

200.    Based on the analysis set forth in this affidavit, City Drugs Pharmacy, Inc., was reimbursed at least $3,695,554.43 for medications that it did not have sufficient inventory to dispense.

201.    Given the facts obtained during this investigation and set forth herein, there is probable cause to believe that City Drugs Pharmacy, Inc., fraudulently billed the Medicare and Medicaid program for at least $3,695.554.43, and the funds were deposited into Bank of America Account No. 375000416581.  Thus, these funds constitute proceeds of health care fraud, wire fraud, and a conspiracy to commit health care fraud in violation of 18 U.S.C. §§ 1347 and 1349, respectively, and any legitimate funds were commingled with illegitimate funds then transferred to several Tier Two Accounts later identified herein.

### *Tier Two Personal Accounts*

202.    Your Affiant reiterates that accounts with a "Tier Two" designation are individually and personally owned and or controlled accounts that received illegally obtained monies by way of transfer of funds, wire, deposits of checks, interbank transfers, or by withdrawal and deposits from "Tier One," both those

included herein for seizure as well as other pharmacy accounts that are presently closed, as receiving fraudulently obtained payments for the distribution of prescription medication the respective pharmacies did not have sufficient inventory to distribute.  The accounts that follow and sought for seizure, have been broken down and separated by individual ownership and control.

### *Target Accounts Held by Kindy Ghussin Sought for Seizure*

203.    Investigation and analysis of the previously identified Medicare Tier One business repository accounts, determined that for the period running December 2011 through June 2019, two personal accounts owned and controlled by Kindy Ghussin, identified as Chase Bank Account No. 2042883021 and Key Bank Account No. 327840071176, respectively, received a total of $995,337.00 in deposits/transfers from five Tier One Medicare Repository accounts that received payment for medication they did not have sufficient medication to distribute, and thus, should not have been paid for.

204.  **JP Morgan Chase Bank Account No. 2042883021 held in the name of Kindy Ghussin**, received:

   a.  *$486,195.00 from Heartland Pharmacy Tier One JP Morgan Chase Tier One business account No. 464668685.*

   b.  *$275,047.00 from Heartland Pharmacy 2, LLC Tier One JP Morgan*

*Chase business account No. 473353055.*

c. *$122,600.00 from closed Middletown Pharmacy, Wesbanco Tier One business Account No. 3577009740.*

d. *$25,600 from Wayne Campus Pharmacy Bank of America Tier One business account No. 375008953994.*

205.   Given the facts obtained during this investigation and set forth herein, there is probable cause to believe that Heartland Pharmacy, LLC, Heartland Pharmacy 2 LLC, Middletown Pharmacy and Wayne Campus Pharmacy, fraudulently billed the Medicare and Medicaid program, and transferred at least $909,442.00 of the illegally obtained funds in the amounts described in bullets "a through d" of paragraph 187 of this affidavit, to JP Morgan Chase Bank Account No. 2042883021.  These funds constitute proceeds of health care fraud, wire fraud, and a conspiracy to commit health care fraud in violation of 18 U.S.C. §§ 1347 and 1349, respectively, and any legitimate funds were commingled with illegitimate funds.

206.   In addition to being proceeds of the health care fraud scheme, there is probable cause to believe that all funds on deposit in this account were involved in concealing or disguising the nature, source, location, ownership, and control of the criminal proceeds in violation of 18 U.S.C. § 1956(a)(1)(B)(i), and therefore subject to seizure and forfeiture pursuant to 18

U.S.C.§§ 981(a)(1)(A) and 982(a)(1).

207.    There is also probable cause to believe that at least 20 transfers, including the three transfers from 2019 set forth below, into this account from Wesbanco Bank Account Number 3577009740 and JP Morgan Chase Bank Account Number 464668685, constitute a violation of 18 U.S.C. § 1957 in that: (1) the deposits were monetary transactions involving criminally derived funds; (2) those criminally derived funds had a value greater than $10,000; (3) the funds were originally derived from health care fraud and a conspiracy to commit health care fraud in violation of 18 U.S.C. § 371, 42 U.S.C. § 1320a-7b(b)(2)(A), and 18 U.S.C. §§ 1347 and 1349, which are specified unlawful activities under 18 U.S.C. §§ 1956(c) and 1961(1); and (4) the transactions occurred in the United States.

| *Transferred from* | *Date* | *Amount* |
|---|---|---|
| Chase Bank - 464668685 | 06/05/2019 | $175,000.00 |
| Chase Bank - 464668685 | 06/10/2019 | $50,000.00 |
| Chase Bank - 464668685 | 06/12/2019 | $15,000.00 |

208.    **Key Bank Account No. 327840071176 held in the name of Kindy Ghussin**, received**:**

   a.  *$27,500.00 from Heartland Pharmacy Tier One JP Morgan Chase Tier One business account No. 464668685.*

    b.   *$11,033.00 from Heartland Pharmacy 2, LLC Tier One JP Morgan*
        *Chase business account No. 473353055.*

    c.   *$2,242.00 from Waso Health Care JP Morgan business Tier One*
        *business account No. 453546330.*

    d.   *$39,200.00 from closed Middletown Pharmacy, Wesbanco Tier One*
        *business Account No. 3577009740.*

    e.   *$5,920.00 from Wayne Campus Pharmacy Bank of America Tier One*
        *business account No. 375008953994.*

209.   Given the facts obtained during this investigation and set forth herein, there is probable cause to believe that Heartland Pharmacy, LLC, Heartland Pharmacy 2, LLC, Waso Health Care, Middletown Pharmacy and Wayne Campus Pharmacy, fraudulently billed the Medicare and Medicaid program, and transferred at least $85,895.00 of the illegally obtained funds as described in bullets "a through e" of paragraph 191 of this affidavit, to Key Bank Account No. 327840071176. Thus, these funds constitute proceeds of health care fraud, wire fraud, and a conspiracy to commit health care fraud in violation of 18 U.S.C. §§ 1347 and 1349, respectively, and any legitimate funds were commingled with illegitimate funds.

210.   In addition to being proceeds of the health care fraud scheme, there is probable cause to believe that all funds on deposit in this account were

involved in concealing or disguising the nature, source, location, ownership, and control of the criminal proceeds in violation of 18 U.S.C. § 956(a)(1)(B)(i), and therefore subject to seizure and forfeiture pursuant to 18 U.S.C.§§ 981(a)(1)(A) and 982(a)(1).

211. There is also probable cause to believe that a least $11,612.84 transferred into this account from JP Morgan Chase Bank Account Number 464668685 on June 19, 2019, constitutes a violation of 18 U.S.C. § 1957 in that: (1) the deposit was a monetary transaction involving criminally derived funds; (2) those criminally derived funds had a value greater than $10,000; (3) the funds were originally derived from health care fraud and a conspiracy to commit health care fraud in violation of 18 U.S.C. § 371, 42 U.S.C. § 1320a-7b(b)(2)(A), and 18 U.S.C. §§ 1347 and 1349, which are specified unlawful activities under 18 U.S.C. §§ 1956(c) and 1961(1); and (4) the transactions occurred in the United States.

### *Target Accounts Held by Hassan Abdallah Sought for Seizure*

212. Investigation and analysis of the previously identified Medicare Tier One business repository accounts, determined that for the period running October 2010 through August 2019, Bank of America personal account No. 5961375028, owned and controlled by Hassan Abdallah, received a total of $3,620,613.00 in

deposits/transfers from eight Tier One Medicare Repository accounts that received

payment for medication they did not have sufficient medication to distribute, and

thus, should not have been paid for.

213. **Bank of America Account No. 5961375028, held in the name of**

**Hassan Abdallah**, received**:**

    a. *$270,510.00 from Heartland Pharmacy Tier One JP Morgan Chase*

      *Tier One business account No. 464668685.*

    b. *$249,765.00 from Heartland Pharmacy 2, LLC Tier One JP Morgan*

      *Chase business account No. 473353055.*

    c. *$16,025.00 from Connor Pharmacy Bank of America business Tier*

      *One business account No. 375015506978.*

    d. *$126,900.00 from closed Middletown Pharmacy, Wesbanco Tier One*

      *business Account No. 3577009740.*

    e. *$23,968.00 from Wayne Campus Pharmacy Bank of America Tier*

      *One business account No. 375008953994.*

    f. *$1,346,284.00 from closed Eastside Pharmacy Bank of America Tier*

      *One business account No. 375000285220.*

    g. *$445,750.00 from City Drugs Bank of America business account No.*

      *375000416581.*

    h. *$1,141,411.00 from closed Harper Drugs Tier One Bank of America*

*business Account No. 5403452005.*

214.   Records from Bank of America also show that from October 2010 through August 2019, in a series of transactions, $3,620,613.00 was moved from the above-referenced Tier One accounts into Bank of America Account No. 5961375028. Because of these transfers, Bank of America Account No. 5961375028 is a Tier Two account.

215.   Given the facts obtained during this investigation and set forth herein, there is probable cause to believe that Heartland Pharmacy, LLC, Heartland Pharmacy 2, LLC, Connor Pharmacy, Middletown Pharmacy, Wayne Campus Pharmacy and Eastside Pharmacy, City Drugs and Harper Drugs, fraudulently billed the Medicare and Medicaid program, and transferred at least $3,620,613.00 of the illegally obtained funds in the amounts described in bullets "a through h" of paragraph 196 of this affidavit, to Bank of America Account No. 5961375028. Thus, these funds constitute proceeds of health care fraud, wire fraud, and a conspiracy to commit health care fraud in violation of 18 U.S.C. §§ 1347 and 1349, respectively, and any legitimate funds were commingled with illegitimate funds.

216.   In addition to being proceeds of the health care fraud scheme, there is probable cause to believe that all funds on deposit in this account were involved in concealing or disguising the nature, source, location, ownership,

and control of the criminal proceeds in violation of 18 U.S.C. §

1956(a)(1)(B)(i), and therefore subject to seizure and forfeiture pursuant to 18

U.S.C.§§ 981(a)(1)(A) and 982(a)(1).

217.   There is also probable cause to believe that at least nine in transfers

into this account from Bank of America Account Number 005403452005,

constitutes  violations of 18 U.S.C. § 1957 in that: (1) the deposits were

monetary transactions involving criminally derived funds; (2) those criminally

derived funds had a value greater than $10,000; (3) the funds were originally

derived from health care fraud and a conspiracy to commit health care fraud in

violation of 18 U.S.C. § 371, 42 U.S.C. § 1320a-7b(b)(2)(A), and 18 U.S.C. §§

1347 and 1349, which are specified unlawful activities under 18 U.S.C. §§

1956(c) and 1961(1); and (4) the transactions occurred in the United States.

Those transactions are detailed below:

| Transferred from | Date | Amount |
|---|---|---|
| Bank of America-005403452005 | 09/07/2016 | $275,000.00 |
| Bank of America-005403452005 | 10/03/2016 | $50,000.00 |
| Bank of America-375000285220 | 05/31/2016 | $15,000.00 |
| Bank of America-375000285220 | 06/13/2016 | $15,000.00 |
| Bank of America-375000285220 | 07/13/2016 | $20,000.00 |
| Bank of America-375000285220 | 08/17/2016 | $20,000.00 |
| Bank of America-375000285220 | 09/19/2016 | $24,000.00 |

| Bank of America-375000285220 | 09/23/2016 | $13,500.00 |
| Bank of America-375000285220 | 10/19/2016 | $13,000.00 |

### *Target Accounts Held by Auday Maki Sought for Seizure*

218.   Investigation and analysis of the previously identified Medicare Tier One business repository accounts, determined that for the period running January 2011 through November 2019, two personal accounts owned and controlled by Audi Maki, identified as Michigan First Credit Union account No. 15041894 and Michigan First Credit Union account No. 10556740 (Checking and Savings) respectively, received a total of $1,123,818.00 in deposits/transfers from a Tier One Medicare Repository account that received payment for medication they did not have sufficient medication to distribute, and thus, should not have been paid for.

219.   **Michigan First Credit Union account No. 15041894, held in the name of Auday Maki** - Records from Michigan First Credit Union show that from January 2011, to November 2019, in a series of transactions, $379,000.00 was moved from Tier One City Drugs Pharmacy business account No. 375000416581 into Michigan First Credit Union account No. 15041894. Because of these transfers First Credit Union account No. 15041894, is a Tier Two account.

220.   Given the facts obtained during this investigation and set forth herein, there is probable cause to believe that City Drugs Pharmacy, fraudulently billed the

Medicare and Medicaid program, and transferred $379,000.00 of the illegally

obtained funds in the amount described in paragraph 202 of this affidavit, to First

Credit Union account No. 15041894. Thus, these funds constitute proceeds of

health care fraud, wire fraud, and a conspiracy to commit health care fraud in

violation of 18 U.S.C. §§ 1347 and 1349, respectively, and any legitimate funds

were commingled with illegitimate funds.

221.   In addition to being proceeds of the health care fraud scheme, there

is probable cause to believe that all funds on deposit in this account were

involved in concealing or disguising the nature, source, location, ownership,

and control of the criminal proceeds in violation of 18 U.S.C. §

1956(a)(1)(B)(i), and therefore subject to seizure and forfeiture pursuant to 18

U.S.C.§§ 981(a)(1)(A) and 982(a)(1).

222.   There is also probable cause to believe that at least one transfer of

$17,000.00 conducted on October 10, 2014 into this account from the Tier One

City Drugs business account identified above, constitutes a violation of 18 U.S.C.

§ 1957 in that: (1) the deposit was a monetary transaction involving criminally

derived funds; (2) those criminally derived funds had a value greater than

$10,000; (3) the funds were originally derived from health care fraud and a

conspiracy to commit health care fraud in violation of 18 U.S.C. § 371, 42

U.S.C. § 1320a-7b(b)(2)(A), and 18 U.S.C. §§ 1347 and 1349, which are

specified unlawful activities under 18 U.S.C. §§ 1956(c) and 1961(1); and (4)
the transactions occurred in the United States.

223.   **Michigan First Credit Union account No. 10556740, held in the
name of Auday Maki and Salwa Atwan** - Records from Michigan First Credit
Union show that from January 2011 to November 2019, in a series of transactions
$744,818.00 was moved from Tier One City Drugs Pharmacy business account
No. 375000416581 into Michigan First Credit Union account No. 10556740.
Because of these transfers First Credit Union account No. 15041894, is a Tier Two
account.

224.   Given the facts obtained during this investigation and set forth herein,
there is probable cause to believe that City Drugs Pharmacy, fraudulently billed the
Medicare and Medicaid program, and transferred $744,818.00 of the illegally
obtained funds in the amount described in paragraph 206 of this affidavit, to First
Credit Union account No. 15041894. Thus, these funds constitute proceeds of
health care fraud, wire fraud, and a conspiracy to commit health care fraud in
violation of 18 U.S.C. §§ 1347 and 1349, respectively, and any legitimate funds
were commingled with illegitimate funds.

225.   In addition to being proceeds of the health care fraud scheme, there
is probable cause to believe that all funds on deposit in this account were
involved in concealing or disguising the nature, source, location, ownership,

and control of the criminal proceeds in violation of 18 U.S.C. §

1956(a)(1)(B)(i), and therefore subject to seizure and forfeiture pursuant to 18

U.S.C.§§ 981(a)(1)(A) and 982(a)(1).

### *Target Accounts Held by Hassan Khreizat Sought for Seizure*

226.    Investigation and analysis of the previously identified Medicare Tier

One business repository accounts, determined that for the period running

December 2010 through November 2019, three personal accounts owned and

controlled by Hassan Khreizat, identified as JP Morgan Chase bank account No.

766261051, Bank of America account No. 375014032993, and Fifth Third Bank

account No. 7914512301 respectively, received a total of $2,166,734.00 in

deposits/transfers from four Tier One Medicare Repository accounts that received

payment for medication they did not have sufficient medication to distribute, and

thus, should not have been paid for.

227.    **JP Morgan Chase Bank Account No. 766261051, held in the name

of Hassan Khreizat**, received**:**

*a.      $149,900.00 from closed Eastside Pharmacy Bank of America Tier One*

*business account No. 375000285220, and;*

*b.   $16,503.00 from Connor Pharmacy Bank of America business Tier One*

*business account No. 375015506978.*

*c. $1,047,420 00 from Universal Pharmacy Bank of America Tier One*

*business account No. 005405242693*

*d. $3,000.00 from City Drugs Bank of America business account No.*

*375000416581.*

228.   Records from JP Morgan Chase Bank show that from December 2010, to November 2019, in a series of transactions $149,900.00 was moved from Tier One Eastside Pharmacy business account No. 375000285220, and another $16,503.00 from Tier One Connor Pharmacy business account No. 375015506978, $1,047,420.00 from Tier One Universal Pharmacy business account No. 005405242693, and $3,000.00 from Tier One City Drugs Pharmacy business account No. 375000416581 into JP Morgan Chase bank account No. 766261051. Because of these transfers JP Morgan Chase Bank account No. 571353080, is a Tier Two account.

229.   Given the facts obtained during this investigation and set forth herein, there is probable cause to believe that Eastside Pharmacy, Connor Pharmacy, Universal Pharmacy, and City Drugs Pharmacy respectively, fraudulently billed the Medicare and Medicaid program, and transferred at least $1,216,823 of the illegally obtained funds in the amounts described in bullets "a through d" of paragraph 210 of this affidavit, to JP Morgan Chase Bank Account No.

766261051, held in the name of Hassan Khreizat. Thus, these funds constitute
proceeds of health care fraud, wire fraud, and a conspiracy to commit health care
fraud in violation of 18 U.S.C. §§ 1347 and 1349, respectively, and any legitimate
funds were commingled with illegitimate funds.

230. In addition to being proceeds of the health care fraud scheme, there
is probable cause to believe that all funds on deposit in this account were
involved in concealing or disguising the nature, source, location, ownership,
and control of the criminal proceeds in violation of 18 U.S.C. §
1956(a)(1)(B)(i), and therefore subject to seizure and forfeiture pursuant to 18
U.S.C.§§ 981(a)(1)(A) and 982(a)(1).

231. There is also probable cause to believe that at least one transfer in
the amount of $15,000.00 into this account from Bank of America Account
Number 375015506978 on July 9, 2019, constituted a violation of 18 U.S.C. §
1957 in that: (1) the deposit was a monetary transaction involving criminally
derived funds; (2) those criminally derived funds had a value greater than
$10,000; (3) the funds were originally derived from health care fraud and a
conspiracy to commit health care fraud in violation of 18 U.S.C. § 371, 42
U.S.C. § 1320a-7b(b)(2)(A), and 18 U.S.C. §§ 1347 and 1349, which are
specified unlawful activities under 18 U.S.C. §§ 1956(c) and 1961(1); and (4)
the transactions occurred in the United States.

232. **Bank of America Account No. 375014032993, held in the name of Hassan Khreizat**, received**:**

    *a.* *$244,750.00 from Eastside Pharmacy Bank of America Tier One business account No. 375000285220;*

    *b.* *$1,047,420.00 from Universal Pharmacy Bank of America Tier One business account No. 005405242693*

    *c.* *$285,000.00 from Connor Pharmacy Bank of America business Tier One business account No. 375015506978.*

233. Records from Bank of America show that from December 2010, to July 2019, in a series of transactions $244,750.00 was moved from Tier One Eastside Pharmacy business account No. 375000285220, $1,047,420.00, Universal Pharmacy Bank of America Tier One business account No. 005405242693, and another $285,000.00 from Tier One Connor Pharmacy business account No. 375015506978 into Bank of America account No. 375014032993. Because of these transfers JP Morgan Chase Bank account No. 375014032993, is a Tier Two account.

234. Given the facts obtained during this investigation and set forth herein, there is probable cause to believe that Eastside Pharmacy and Connor Pharmacy respectively, fraudulently billed the Medicare and Medicaid program, and transferred  at least $1,577,170.00 of the illegally obtained funds in the amounts

described in bullets "a through c" of paragraph 215 of this affidavit, to Bank of America Account No. 375014032993, held in the name of Hassan Khreizat. Thus, these funds constitute proceeds of health care fraud, wire fraud, and a conspiracy to commit health care fraud in violation of 18 U.S.C. §§ 1347 and 1349, respectively, and any legitimate funds were commingled with illegitimate funds.

235.   In addition to being proceeds of the health care fraud scheme, there is probable cause to believe that all funds on deposit in this account were involved in concealing or disguising the nature, source, location, ownership, and control of the criminal proceeds in violation of 18 U.S.C. § 1956(a)(1)(B)(i), and therefore subject to seizure and forfeiture pursuant to 18 U.S.C.§§ 981(a)(1)(A) and 982(a)(1).

236.   There is also probable cause to believe that transfers into this account totaling $254,000.00 from Bank of America Account Number 375015506978 and Bank of America Account Number 375000285220 respectively, constituted a violation of 18 U.S.C. § 1957 in that: (1) the deposits were monetary transactions involving criminally derived funds; (2) those criminally derived funds had a value greater than $10,000; (3) the funds were originally derived from health care fraud and a conspiracy to commit health care fraud in violation of 18 U.S.C. § 371, 42 U.S.C. § 1320a-7b(b)(2)(A), and 18 U.S.C. §§ 1347 and 1349, which are specified unlawful activities under 18

U.S.C. §§ 1956(c) and 1961(1); and (4) the transactions occurred in the United

States. Those transactions are detailed below:

| Transferred from | Date | Amount |
|---|---|---|
| Bank of America 375015506978 | 01/23/2017 | $25,000.00 |
| Bank of America 375015506978 | 02/06/2018 | $37,000.00 |
| Bank of America 375015506978 | 03/06/2018 | $20,000.00 |
| Bank of America 375015506978 | 04/11/2018 | $20,000.00 |
| Bank of America 375015506978 | 05/04/2018 | $20,000.00 |
| Bank of America 375015506978 | 06/15/2018 | $25,000.00 |
| Bank of America 375015506978 | 07/16/2018 | $15,000.00 |
| Bank of America 375015506978 | 08/06/2018 | $15,000.00 |
| Bank of America 375015506978 | 08/30/2018 | $17,500.00 |
| Bank of America 375015506978 | 10/05/2018 | $15,000.00 |
| Bank of America 375015506978 | 11/08/2018 | $17,500.00 |
| Bank of America 375015506978 | 12/27/2016 | $15,000.00 |
| Bank of America 375000285220 | 09/19/2016 | $12,000.00 |

237.    **Fifth Third Bank Account No. 7914512301, held in the name of**

**Hassan Khreizat**, received**:**

    a.  *$133,000.00 from closed Eastside Pharmacy Bank of America Tier*

       *One business account No. 375000285220, and;*

    b.  *$49,500.00 from City Drugs Pharmacy Bank of America business*

*account No. 375000416581*

238.   Records from Fifth Third Bank show that from December 2010, to November 2019, in a series of transactions $133,000.00 was moved from Tier One Eastside Pharmacy business account No. 375000285220, and another $49,500.00 from Tier One Connor Pharmacy business account No. 375015506978 into Fifth Third Bank Account No. 7914512301. Because of these transfers Fifth Third Bank Account No. 7914512301, is a Tier Two account.

239.   Given the facts obtained during this investigation and set forth herein, there is probable cause to believe that Eastside Pharmacy and City Drugs Pharmacy respectively, fraudulently billed the Medicare and Medicaid program, and transferred at least $182,500 of the illegally obtained funds in the amounts described in bullets "a & b" of paragraph 220 of this affidavit, to Fifth Third Bank No. 7914512301, held in the name of Hassan Khreizat. Thus, these funds constitute proceeds of health care fraud, wire fraud, and a conspiracy to commit health care fraud in violation of 18 U.S.C. §§ 1347 and 1349, respectively, and any legitimate funds were commingled with illegitimate funds.

240.   In addition to being proceeds of the health care fraud scheme, there is probable cause to believe that all funds on deposit in this account were involved in concealing or disguising the nature, source, location, ownership, and control of the criminal proceeds in violation of 18 U.S.C. §

1956(a)(1)(B)(i), and therefore subject to seizure and forfeiture pursuant to 18

U.S.C.§§ 981(a)(1)(A) and 982(a)(1).

### *Target Accounts Held by Nofal Cholag Sought for Seizure*

241.   Investigation and analysis of the previously identified Medicare Tier

One business repository accounts, determined that for the period running

December 2010 through July 2019, personal accounts owned and controlled by

Nofal Cholag, identified as Flagstar Bank account No. 128170579, Flagstar Bank

account No. 570421834, TCF Bank account No. 2883080947, and TCF Bank

account No. 5444525668, respectively, received a total of $1,420,196.00 in

deposits/transfers from one Tier One Medicare Repository account that received

payment for medication they did not have sufficient medication to distribute, and

thus, should not have been paid for.

242.   **Flagstar Bank Account No. 128170579, held in the name of Nofal**

**Cholag -** Records from Flagstar Bank show that between January 2011 and July

2019, in a series of transactions $25,000.00 was moved from Tier One Universal

Pharmacy Bank of America business account No. 005405242693 into Flagstar

Bank account No. 128170579. Because of this transfer Flagstar Bank account No.

128170579, is a Tier Two account.

243.   Given the facts obtained during this investigation and set forth herein,

there is probable cause to believe that Universal Pharmacy fraudulently billed the

Medicare and Medicaid program, and transferred $25,000 of the illegally obtained

funds in the amounts described in paragraph 225 of this affidavit, to Flagstar Bank

account No. 128170579, held in the name of Nofal Cholag. Thus, these funds

constitute proceeds of health care fraud, wire fraud, and a conspiracy to commit

health care fraud in violation of 18 U.S.C. §§ 1347 and 1349, respectively, and any

legitimate funds were commingled with illegitimate funds.

244.   In addition to being proceeds of the health care fraud scheme, there

is probable cause to believe that all funds on deposit in this account were

involved in concealing or disguising the nature, source, location, ownership,

and control of the criminal proceeds in violation of 18 U.S.C. §

1956(a)(1)(B)(i), and therefore subject to seizure and forfeiture pursuant to 18

U.S.C.§§ 981(a)(1)(A) and 982(a)(1).

245.   **Flagstar Bank Account No. 570421834, held in the name of Nofal**

**Cholag** - Records from Flagstar Bank show that from January 2011, to July 2019,

in a series of transactions totaling $255,644.00 was moved from Tier One

Universal Pharmacy Bank of America business account No. 005405242693, into

Flagstar Bank Account No. 570421834. Because of these transfers Flagstar Bank

account No. 570421834, is a Tier Two account.

246.   Given the facts obtained during this investigation and set forth herein,

there is probable cause to believe that Universal Pharmacy fraudulently billed the

Medicare and Medicaid program, and transferred $255,644.00 of the illegally

obtained funds, to Flagstar Bank account No. 570421834, held in the name of

Nofal Cholag. Thus, these funds constitute proceeds of health care fraud, wire

fraud, and a conspiracy to commit health care fraud in violation of 18 U.S.C. §§

1347 and 1349, respectively, and any legitimate funds were commingled with

illegitimate funds.

247.   In addition to being proceeds of the health care fraud scheme, there

is probable cause to believe that all funds on deposit in this account were

involved in concealing or disguising the nature, source, location, ownership,

and control of the criminal proceeds in violation of 18 U.S.C. §

1956(a)(1)(B)(i), and therefore subject to seizure and forfeiture pursuant to 18

U.S.C.§§ 981(a)(1)(A) and 982(a)(1).

248.   There is also probable cause to believe that $42,163.42 in transfers

into this account from the Tier One account identified above, between October

2015, to May 2019, constitutes a violation of 18 U.S.C. § 1957 in that: (1) the

deposits were monetary transactions involving criminally derived funds; (2)

those criminally derived funds had a value greater than $10,000; (3) the funds

were originally derived from health care fraud and a conspiracy to commit

health care fraud in violation of 18 U.S.C. § 371, 42 U.S.C. § 1320a-

7b(b)(2)(A), and 18 U.S.C. §§ 1347 and 1349, which are specified unlawful

activities under 18 U.S.C. §§ 1956(c) and 1961(1); and (4) the transactions

occurred in the United States. These transactions are detailed below:

| Transferred from | Date | Amount |
|---|---|---|
| Bank of America 5405242693 | 10/27/2015 | $11,500.00 |
| Bank of America 5405242693 | 11/28/2015 | $10,221.14 |
| Bank of America 5405242693 | 12/17/2015 | $10,221.14 |
| Bank of America 5405242693 | 05/30/2019 | $10,221.14 |

249.   **TCF National Bank Account No. 2883080947, held in the name of**

**Nofal Cholag** - Records from TCF National Bank show that from January 2011, to

July 2019, in a series of transactions, $1,121,421.00 was moved from Tier One

Universal Pharmacy Bank of America business account No. 005405242693, into

TCF National Bank Account No. 2883080947. Because of these transfers TCF

National Bank account No. 2883080947, is a Tier Two account.

250.   Given the facts obtained during this investigation and set forth herein,

there is probable cause to believe that Universal Pharmacy fraudulently billed the

Medicare and Medicaid program, and transferred $1,121,421 of the illegally

obtained funds, to TCF National Bank account No. 2883080947, held in the name

of Nofal Cholag. Thus, these funds constitute proceeds of health care fraud, wire

fraud, and a conspiracy to commit health care fraud in violation of 18 U.S.C. §§

1347 and 1349, respectively, and any legitimate funds were commingled with

illegitimate funds.

251.   In addition to being proceeds of the health care fraud scheme, there is probable cause to believe that all funds on deposit in this account were involved in concealing or disguising the nature, source, location, ownership, and control of the criminal proceeds in violation of 18 U.S.C. § 1956(a)(1)(B)(i), and therefore subject to seizure and forfeiture pursuant to 18 U.S.C.§§ 981(a)(1)(A) and 982(a)(1).

252.   There is also probable cause to believe that $52,305.93 in transfers into this account from the Tier One account identified above, between December 2015, to June 2019, constituted a violation of 18 U.S.C. § 1957 in that: (1) the deposits were monetary transactions involving criminally derived funds; (2) those criminally derived funds had a value greater than $10,000; (3) the funds were originally derived from health care fraud and a conspiracy to commit health care fraud in violation of 18 U.S.C. § 371, 42 U.S.C. § 1320a-7b(b)(2)(A), and 18 U.S.C. §§ 1347 and 1349, which are specified unlawful activities under 18 U.S.C. §§ 1956(c) and 1961(1); and (4) the transactions occurred in the United States.

These transactions are detailed below:

| Transferred from | Date | Amount |
|---|---|---|
| Bank of America 5405242693 | 12/24/2015 | $10,221.14 |

| Bank of America 5405242693 | 02/22/2016 | $10,194.93 |
|---|---|---|
| Bank of America 5405242693 | 03/14/2016 | $10,194.93 |
| Bank of America 5405242693 | 03/24/2016 | $10,194.93 |
| Bank of America 5405242693 | 06/03/2019 | $11,500.00 |

253.   **TCF National Bank Account No. 5444525668, held in the name of Nofal Cholag** - Records from TCF National Bank show that from January 2011, to July 2019, through several transactions, $18,131.00 was moved from Tier One Universal Pharmacy Bank of America business account No. 005405242693, into TCF National Bank Account No. 5444525668. Because of these transfers TCF National Bank account No. 5444525668 is a Tier Two account.

254.   Given the facts obtained during this investigation and set forth herein, there is probable cause to believe that Universal Pharmacy fraudulently billed the Medicare and Medicaid program, and transferred $18,131.00 of the illegally obtained funds, to TCF National Bank account No. 5444525668, held in the name of Nofal Cholag. Thus, these funds constitute proceeds of health care fraud, wire fraud, and a conspiracy to commit health care fraud in violation of 18 U.S.C. §§ 1347 and 1349, respectively, and any legitimate funds were commingled with illegitimate funds.

255.   In addition to being proceeds of the health care fraud scheme, there is probable cause to believe that all funds on deposit in this account were

involved in concealing or disguising the nature, source, location, ownership, and control of the criminal proceeds in violation of 18 U.S.C. § 1956(a)(1)(B)(i), and therefore subject to seizure and forfeiture pursuant to 18 U.S.C.§§ 981(a)(1)(A) and 982(a)(1).

### *Target Accounts Held by Raef Hamaed Sought for Seizure*

256.   Investigation and analysis of the previously identified Medicare Tier One business repository accounts, determined that for the period running December 2010 through July 2019, personal accounts owned and controlled by Raef Hamaed, identified as Bank of America Account No. 375000823404, RBS Citizens Bank Account No. 3650366735, JP Morgan Chase Bank Account No. 936801232,  and Bank of America Account No. 375007629106,  respectively, received a total of $2,281,410.00 in deposits/transfers from seven Tier One Medicare Repository accounts that received payment for medication they did not have sufficient medication to distribute, and thus, should not have been paid for.

257.   **Bank of America Account No. 37500823404, held in the name of Raef Hamaed**, received**:**

> a.   *$272,900.00 from Eastside Pharmacy Bank of America Tier One business account No. 375000285220.*
>
> b.   *$180,050.00 from Heartland Pharmacy 2, LLC Tier One JP Morgan Chase business account No. 473353055.*

c.  *$417,319.00 from closed Harper Drugs Tier One Bank of America business Account No. 5403452005.*

d.  *$18,000.00 from Wayne Campus Pharmacy Bank of America Tier One business account No. 375008953994.*

e.  *$37,900.00 from closed Middletown Pharmacy, Wesbanco Tier One business Account No. 3577009740.*

f.  *$128,560.00 from Heartland Pharmacy Tier One JP Morgan Chase Tier One business account No. 464668685*

g.  *$81,800.00 from City Drugs Bank of America business account No. 375000416581.*

258.   Records from Bank of America show that from December 2010, to July 2019, in a series of transactions, $272,900.00 was moved from Tier One Eastside Pharmacy business account No. 375000285220, $180,050.00 from Heartland Pharmacy2 LLC, Tier One JP Morgan Chase Bank business account No. 473353055, $417,319.00 from closed Harper Drugs Tier One Bank of America business account No. 5403452005, $18,000.00 from Wayne Campus Pharmacy Tier One Bank of America business account No. 375008953994, Middletown Pharmacy Tier One Wesbanco business account No. 3577009740, $128,560.00 from Heartland Pharmacy Tier One JP Morgan Chase Bank business account No. 464668685, and another $81,800.00 from Tier One City Drugs Bank of America

business account No. 375000416581, into Bank of America account No. 37500823404. Because of these transfers, Bank of America account No. 37500823404 is a Tier Two account.

259.   Given the facts obtained during this investigation and set forth herein, there is probable cause to believe that Eastside Pharmacy, Heartland Pharmacy 2, LLC, Harper Drugs, Wayne Campus Pharmacy, Middletown Pharmacy, Heartland Pharmacy, and City Drugs, fraudulently billed the Medicare and Medicaid program, and transferred at least $1,136,529 of the illegally obtained funds in the amounts described in bullet "a through g" of paragraph 240 of this affidavit, to Bank of America account No. 37500823404, held in the name of Raef Hamaed. Thus, these funds constitute proceeds of health care fraud, wire fraud, and a conspiracy to commit health care fraud in violation of 18 U.S.C. §§ 1347 and 1349, respectively, and any legitimate funds were commingled with illegitimate funds.

260.   In addition to being proceeds of the health care fraud scheme, there is probable cause to believe that all funds on deposit in this account were involved in concealing or disguising the nature, source, location, ownership, and control of the criminal proceeds in violation of 18 U.S.C. § 1956(a)(1)(B)(i), and therefore subject to seizure and forfeiture pursuant to 18 U.S.C.§§ 981(a)(1)(A) and 982(a)(1).

261.   There is also probable cause to believe that $447,700 in transfers into this account from the Tier One account identified above, between July 2014, thru May 2017, constituted a violation of 18 U.S.C. § 1957 in that: (1) the deposits were monetary transactions involving criminally derived funds; (2) those criminally derived funds had a value greater than $10,000; (3) the funds were originally derived from health care fraud and a conspiracy to commit health care fraud in violation of 18 U.S.C. § 371, 42 U.S.C. § 1320a-7b(b)(2)(A), and 18 U.S.C. §§ 1347 and 1349, which are specified unlawful activities under 18 U.S.C. §§ 1956(c) and 1961(1); and (4) the transactions occurred in the United States. Those transactions are detailed below:

| Transferred from | Date | Amount |
|---|---|---|
| Bank of America 5403452005 | 09/06/2016 | $275,000.00 |
| Bank of America 5403452005 | 09/29/2016 | $50,000.00 |
| Chase Bank 473353055 | 08/29/2016 | $12,000.00 |
| Chase Bank 473353055 | 09/06/2016 | $10,500.00 |
| Chase Bank 473353055 | 11/08/2016 | $18,000.00 |
| Chase Bank 473353055 | 02/07/2017 | $21,000.00 |
| Chase Bank 464668685 | 09/01/2015 | $11,000.00 |
| Chase Bank 464668685 | 03/07/2017 | $11,700.00 |
| Chase Bank 464668685 | 05/08/2017 | $13,000.00 |
| WesBanco Bank 3577009740 | 07/08/2014 | $14,000.00 |

| WesBanco Bank 3577009740 | 09/23/2014 | $12,700.00 |
|---|---|---|

262.   **JP Morgan Chase Bank Account No. 936801232, held in the name of Raef Hamaed**, received**:**

a.     *$179,309.00 from Eastside Pharmacy Bank of America Tier One business account No. 375000285220.*

b.      *$50,328.00 from Heartland Pharmacy 2, LLC Tier One JP Morgan Chase business account No. 473353055.*

c.     *$448,106.00 from Harper Drugs Tier One Bank of America business Account No. 5403452005.*

d.     *$14,528.00 from Wayne Campus Pharmacy Bank of America Tier One business account No. 375008953994.*

e.     *$33,600.00 from closed Middletown Pharmacy, Wesbanco Tier One business Account No. 3577009740.*

f.     *$202,850.00 from Heartland Pharmacy Tier One JP Morgan Chase Tier One business account No. 464668685.*

g.     *$89,100.00 from City Drugs Bank of America business account No. 375000416581.*

263.   Records from JP Morgan Chase Bank show that from December 2010, to July 2019, in a series of transactions $179,309.00 was moved from Tier

One Eastside Pharmacy business account No. 375000285220, $50,328.00 from Heartland Pharmacy2 LLC, Tier One JP Morgan Chase Bank business account No. 473353055, $448,106.00 from Harper Drugs Tier One Bank of America business account No. 5403452005, $14,528.00 from Wayne Campus Pharmacy Tier One Bank of America business account No. 375008953994, $33,600.00 from Middletown Pharmacy Tier One Wesbanco business account No. 3577009740, $202,850.00 from Heartland Pharmacy Tier One JP Morgan Chase Bank business account No. 464668685, and another $89,100.00 from Tier One City Drugs Bank of America business account No. 375000416581, into JP Morgan Chase Bank account No. 936801232. Because of these transfers, JP Morgan Chase Bank account No. 936801232 is a Tier Two account.

264.   Given the facts obtained during this investigation and set forth herein, there is probable cause to believe that Eastside Pharmacy, Heartland Pharmacy 2, LLC, Harper Drugs, Wayne Campus Pharmacy, Middletown Pharmacy, Heartland Pharmacy, and City Drugs, fraudulently billed the Medicare and Medicaid program, and transferred at least $1,017,821 of the illegally obtained funds in the amounts described in bullet "a through g" of paragraph 245 of this affidavit, to JP Morgan Bank account No. 936801232 , held in the name of Raef Hamaed. Thus, these funds constitute proceeds of health care fraud, wire fraud, and a conspiracy to commit health care fraud in violation of 18 U.S.C. §§ 1347 and 1349, respectively,

and any legitimate funds were commingled with illegitimate funds.

265.   In addition to being proceeds of the health care fraud scheme, there is probable cause to believe that all funds on deposit in this account were involved in concealing or disguising the nature, source, location, ownership, and control of the criminal proceeds in violation of 18 U.S.C. § 1956(a)(1)(B)(i), and therefore subject to seizure and forfeiture pursuant to 18 U.S.C.§§ 981(a)(1)(A) and 982(a)(1).

266.   There is also probable cause to believe that $88,800.00 in transfers into this account from the Tier One account identified above, between November 2013, to December 2017 constituted a violation of 18 U.S.C. § 1957 in that: (1) the deposits were monetary transactions involving criminally derived funds; (2) those criminally derived funds had a value greater than $10,000; (3) the funds were originally derived from health care fraud and a conspiracy to commit health care fraud in violation of 18 U.S.C. § 371, 42 U.S.C. § 1320a-7b(b)(2)(A), and 18 U.S.C. §§ 1347 and 1349, which are specified unlawful activities under 18 U.S.C. §§ 1956(c) and 1961(1); and (4) the transactions occurred in the United States. Those transactions are detailed below:

| Transferred from | Date | Amount |
|---|---|---|
| Wesbanco Bank 3577009740 | 11/29/2013 | $25,000.00 |
| Chase Bank 464668685 | 11/07/2016 | $15,000.00 |

| Chase Bank 464668685 | 12/27/2016 | $11,000.00 |
| Chase Bank 464668685 | 02/06/2017 | $13,000.00 |
| Chase Bank 464668685 | 10/16/2017 | $10,400.00 |
| Chase Bank 464668685 | 12/28/2017 | $14,400.00 |

267.   **RBS Citizens Bank Account No. 3650366735, held in the name of Raef Hamaed**, received**:**

    a.   *$12,000.00 from Eastside Pharmacy Bank of America Tier One business account No. 375000285220.*

    b.   *$17,000.00 from Harper Drugs Tier One Bank of America business Account No. 5403452005.*

    c.   *$3,060.00 from Wayne Campus Pharmacy Bank of America Tier One business account No. 375008953994.*

    d.   *$18,600.00 from closed Middletown Pharmacy, Wesbanco Tier One business Account No. 3577009740.*

    e.   *$22,500.00 from City Drugs Bank of America business account No. 375000416581.*

268.   Records from RBS Citizens Bank show that from December 2010, to July 2019, in a series of transactions, $12,000.00 was moved from Tier One Eastside Pharmacy business account No. 375000285220, $17,000.00 from Harper Drugs Tier One Bank of America business account No. 5403452005, $3,060.00

from Wayne Campus Pharmacy Tier One Bank of America business account No. 375008953994, $33,600.00 from Middletown Pharmacy Tier One Wesbanco business account No. 3577009740, and another $22,500.00 from Tier One City Drugs Bank of America business account No. 375000416581, into Citizens Bank account No. 3650366735. Because of these transfers, Citizens Bank account No. 3650366735 is a Tier Two account.

269.   Given the facts obtained during this investigation and set forth herein, there is probable cause to believe that Eastside Pharmacy, Harper Drugs, Wayne Campus Pharmacy, Middletown Pharmacy, and City Drugs, fraudulently billed the Medicare and Medicaid program, and transferred at least $73,160 of the illegally obtained funds in the amounts described in bullet "a through e" of paragraph 250 of this affidavit, to Citizens Bank account No. 3650366735, held in the name of Raef Hamaed. Thus, these funds constitute proceeds of health care fraud, wire fraud, and a conspiracy to commit health care fraud in violation of 18 U.S.C. §§ 1347 and 1349, respectively, and any legitimate funds were commingled with illegitimate funds.

270.   In addition to being proceeds of the health care fraud scheme, there is probable cause to believe that all funds on deposit in this account were involved in concealing or disguising the nature, source, location, ownership, and control of the criminal proceeds in violation of 18 U.S.C. §

1956(a)(1)(B)(i), and therefore subject to seizure and forfeiture pursuant to 18

U.S.C.§§ 981(a)(1)(A) and 982(a)(1).

271.   **Bank of America Account No. 375007629106, held in the name of**

**Raef Hamaed, received:**  Records from Bank of America show that between

February 2011, to June 2019, $9,000.00 was moved from Tier One Heartland

Pharmacy 2, LLC business account No. 473353055, into Bank of America account

No.375007629106. Because of these transfers, Bank of America account No.

37500629106 is a Tier Two account.

272.   Given the facts obtained during this investigation and set forth herein,

there is probable cause to believe that Heartland Pharmacy 2, LLC, fraudulently

billed the Medicare and Medicaid program, and transferred at least $9,000 of the

illegally obtained funds to Bank of America account No. 375007629106, held in

the name of Raef Hamaed. Thus, these funds constitute proceeds of health care

fraud, wire fraud, and a conspiracy to commit health care fraud in violation of 18

U.S.C. §§ 1347 and 1349, respectively, and any legitimate funds were

commingled with illegitimate funds.

273.   In addition to being proceeds of the health care fraud scheme, there

is probable cause to believe that all funds on deposit in this account were

involved in concealing or disguising the nature, source, location, ownership,

and control of the criminal proceeds in violation of 18 U.S.C. §

1956(a)(1)(B)(i), and therefore subject to seizure and forfeiture pursuant to 18

U.S.C.§§ 981(a)(1)(A) and 982(a)(1).

### *Target Accounts Held by Ali Abdelrazzaq Sought for Seizure*

274.   Investigation and analysis of the previously identified Medicare Tier

One business repository accounts determined that for the period running December

2010 through July 2019, a personal account owned and controlled by Ali

Abdelrazzaq, identified as Flagstar Bank Account No. 108125122, received

$12,375.00 in deposits/transfers from a Tier One Medicare Repository account that

received payment for medication it did not have sufficient medication to distribute,

and thus, should not have been paid for.

275.   **Flagstar Bank Account No. 108125122, held in the name of Ali**

**Abdelrazzaq -** Records from Flagstar Bank show that between January 2011 and

July 2019, in a series of transactions $12,375.00 was moved from Tier One Wayne

Campus Pharmacy Bank of America business account No. 375008953994 into

Flagstar Bank account No. 108125122. Because of this transfer Flagstar Bank

account No. 108125122, is a Tier Two account.

276.   Given the facts obtained during this investigation and set forth herein,

there is probable cause to believe that Wayne Campus Pharmacy fraudulently

billed the Medicare and Medicaid program, and transferred $12,375.00 of the

illegally obtained funds in the amounts described in paragraph 258 of this affidavit,

to Flagstar Bank account No. 108125122, held in the name of Ali Abdelrazzaq. Thus, these funds constitute proceeds of health care fraud, wire fraud, and a conspiracy to commit health care fraud in violation of 18 U.S.C. §§ 1347 and 1349, respectively, and any legitimate funds were commingled with illegitimate funds.

277.   In addition to being proceeds of the health care fraud scheme, there is probable cause to believe that all funds on deposit in this account were involved in concealing or disguising the nature, source, location, ownership, and control of the criminal proceeds in violation of 18 U.S.C. § 1956(a)(1)(B)(i), and therefore subject to seizure and forfeiture pursuant to 18 U.S.C.§§ 981(a)(1)(A) and 982(a)(1).

## **CONCLUSION**

278.   I am aware that Title 18 U.S.C. § 981(b)(3) authorizes the issuance of a seizure warrant in any district in which a forfeiture action against the property may be filed under 28 U.S.C. § 1355(b) and may be executed in any district in which the property is found.

279.   I am aware that Title 28 U.S.C. § 1355(b) authorizes the filing of a forfeiture action in the District Court for the district in which any of the action or omission giving rise to the forfeiture occurred.

280.   Given the magnitude and pervasiveness of the illegal activities involved in this scheme, and based upon the information contained in this Affidavit,  there is probable cause to establish that the funds deposited in the following accounts constitute the proceeds and/or gross proceeds of Health Care Fraud, in violation of 18 U.S.C. § 1347, Conspiracy to Commit Health Care Fraud in violation of 18 U.S.C. § 1349, proceeds obtained, directly or indirectly, and/or used or intended to be used in any manner or part to commit, or to facilitate the commission of, and/or constitute property involved in, or are traceable to property involved in, Money Laundering, in violation of 18 U.S.C. § 1956 and or 18 U.S.C. § 1957.

281.   The funds are therefore subject to seizure and civil forfeiture to the United States, pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (C) and 21 U.S.C. § 881(a), and/or are subject to seizure and criminal forfeiture pursuant to 18 U.S.C. § 982(a) and/or Title 18 U.S.C. § 981(a)(1)(C) together with 28 U.S.C. § 2461.

282.   Your affiant requests that for the following accounts, warrants be issued to seize, for purpose of civil and/or criminal forfeiture, all funds on deposit in the following accounts up to the specified amounts:

1. **Up to $395,000 in JP Morgan Chase Bank Account No. 473353055, in the name of Heartland Pharmacy 2, LLC;**

2. **Up to $690,000 in JP Morgan Chase Bank Account No. 464668685, in**

the name of Heartland Pharmacy, LLC;

3.   Up to $379,552.58 in Bank of America Account No. 375008953994, in the name of Wayne Campus Pharmacy, LLC;

4.   Up to $1,405,154.53 in Bank of America Account No. 005405242693, held in the name of Universal Pharmacy, LLC;

5.   Up to $909,442 in JP Morgan Chase Bank Account No. 2042883021, held in the name of Kindy Ghussin;

6.   Up to $85,895 in Key Bank Account No. 327840071176, held in the name of Kindy Ghussin;

7.   Up to $3,620,613 in Bank of America Account No. 5961375028, held in the name of Hassan Abdallah;

8.   Up to $379,000 in Michigan First Credit Union Account No. 15041894, held in the name of Auday Maki;

9.   Up to $744,818 in Michigan First Credit Union Account No. 10556740, held in the name of Auday Maki and Salwa Atwan;

10.   Up to $1,216,823 in JP Morgan Chase Bank Account No. 766261051, held in the name of Hassan Khreizat;

11.   Up to $1,577,170 in Bank of America Account No. 375014032993, held in the name of Hassan Khreizat;

12.   Up to $182,500 in Fifth Third Bank Account No. 7914512301, held in the name of Hassan Khreizat;

13.   Up to $25,000 in Flagstar Bank Account No. 128170579, held in the name of Nofal Cholag

14.   Up to $255,644 in Flagstar Bank Account No. 570421834, held in the name of Nofal Cholag;

15.   **Up to $1,121,421 in TCF National Bank Account No. 2883080947, held in the name of Nofal Cholag;**

16.   **Up to $18,131 in TCF National Bank Account No. 5444525668, held in the name of Nofal Cholag;**

17.   **Up to $1,136,529 in Bank of America Account No. 37500823404, held in the name of Raef Hamaed;**

18.   **Up to $1,017,821 in JP Morgan Chase Bank Account No. 936801232, held in the name of Raef Hamaed;**

19.   **Up to $73,160 in RBS Citizens Bank Account No. 3650366735, held in the name of Raef Hamaed;**

20.   **Up to $9,000 in Bank of America Account No. 375007629106, held in the name of Raef Hamaed;**

21.   **Up to $12,375 in Flagstar Bank Account No. 108125122, held in the name of Ali Abdelrazzaq.**

283.   Affiant requests that each financial institution at which the Subject

Accounts are established be instructed to provide federal agents with the current

account balance upon seizure, as follows:

> **The financial institution upon which this seizure warrant has been served is instructed to provide federal agents authorized to seize the funds with the current balance in each account upon service of the seizure warrant and at the request of the federal agents authorized to seize the funds.**

284.   Affiant further requests that the Court warrant and authorize the FBI

to effect seizure of the accounts, receiving Medicare, Medicaid, and Blue Cross

Blue Shield reimbursements to be pooled for fourteen days to allow for the

collection of reimbursements obtained pursuant to the fraud scheme set forth

herein that have been processed but not paid, as follows:

**The financial institution upon which this seizure warrant has been served is further instructed to allow incoming funds but not allow funds to be withdrawn, transferred, wired, routed or otherwise disbursed by or to any persons (other than the federal agents authorized to seize the funds) for a period of fourteen (14) days from the issuance of the warrant. The financial institution upon which this seizure warrant has been served is instructed to disburse funds to federal agents and without further order of the court.**

**The accounts identified for pooling as described, are as follow:**

**J.P. Morgan Chase Bank Account No. 473353055;**

**J.P. Morgan Chase Bank Account No. 464668685;**

**Bank of America Account No. 375008953994;**

**Bank of America Account No. 005405242693.**

## REQUEST FOR SEALING

285.   It is respectfully requested that this Court issue an order sealing, until

further order of the Court, all papers submitted in support of this application,

including the application and search warrant.  I believe that sealing this document

is necessary because the items and information to be seized are relevant to an

ongoing investigation into the criminal organizations, as not all of the targets of

this investigation will be searched at this time.  Premature disclosure of the

contents of this affidavit and related documents may have a significant and

negative impact on the continuing investigation and may severely jeopardize its

effectiveness.

_____
Special Agent Andrew Crump
Federal Bureau of Investigation

Sworn to before me and signed in my presence
And/or by reliable electronic means.

_____          Dated: _June 5, 2020_
The Honorable David R. Grand
United States Magistrate Judge

111

## <u>ATTACHMENT A</u>

1. All funds on deposit in Bank of America Account Number 5961375028 up to and including $3,620,613
2. All funds on deposit in Bank of America Account Number 375014032993 up to and including $1,577,170
3. All funds on deposit in Bank of America Account Number 37500823404 up to and including $1,136,529
4. All funds on deposit in Bank of America Account Number 375007629106 up to and including $9,000

with permission to serve the warrant electronically followed by original service

**The financial institution upon which this seizure warrant has been served is instructed to provide federal agents authorized to seize the funds with the current balance in each account upon service of the seizure warrant and at the request of the federal agents authorized to seize the funds.**

AUSA:  Shankar Ramamurthy      Telephone:  (313) 226-9562
AO 109 (Rev. 11/13)  Warrant to Seize Property Subject to Forfeiture   Special Agent:      Andrew Crump      Telephone:  (313) 670-5817

# UNITED STATES DISTRICT COURT

for the

Eastern District of Michigan

| | | |
|---|---|---|
| In the Matter of the Seizure of | ) | Case: 2:20−mc−50628 |
| *(Briefly describe the property to be seized)* | ) | Assigned To : Michelson, Laurie J. |
| | ) | Assign. Date : 6/5/2020 |
| All funds on deposit in 4 Bank of America Accounts as | ) Case No. | Description: RE: SEALED MATTER |
| further described on Attachment A | ) | (EOB) |
| | ) | |

## WARRANT TO SEIZE PROPERTY SUBJECT TO FORFEITURE

To:   Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests that certain property located in the _____ Eastern _____ District of _____ Michigan _____ be seized as being subject to forfeiture to the United States of America.  The property is described as follows:

All funds on deposit in 4 Bank of America Accounts as further described on Attachment A with permission to serve the warrant electronically followed by original service

I find that the affidavit(s) and any recorded testimony establish probable cause to seize the property.

**YOU ARE COMMANDED** to execute this warrant and seize the property on or before  June 19, 2020 _____
                                                                                                           *(not to exceed 14 days)*

☑ in the daytime 6:00 a.m. to 10:00 p.m.      ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must also give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

An officer present during the execution of the warrant must prepare, as required by law, an inventory of any property seized and the officer executing the warrant must promptly return this warrant and a copy of the inventory to the presiding United States Magistrate Judge on duty _____ .
       *(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for _____ days (not to exceed 30)      ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:      June 5, 2020    3:48 pm _____      _____
                                                                                                           *Judge's signature*

City and state:      Detroit, MI _____          David R. Grand          U. S. Magistrate Judge
                                                                                    *Printed name and title*

AO 109 (Rev. 11/13)  Warrant to Seize Property Subject to Forfeiture (Page 2)

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of:

Inventory of the property taken:

| Certification |
|---|

  I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*